# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Case No. <u>1:22-cv-1046</u>

|  |  |
|---|---|
| **TIMOTHY B.**, by and through his Guardian ad Litem Robert Ward; **FLORA P.**, by and through her Guardian ad Litem Robert Ward; **ISABELLA A.**, by and through her Guardian ad Litem Jeffrey C. Holden; and **STEPH C.**, by and through his Guardian ad Litem Jeffrey C. Holden, for themselves and for those similarly situated; **DISABILITY RIGHTS NORTH CAROLINA**; and **NORTH CAROLINA STATE CONFERENCE OF NAACP**, <br><br> **Plaintiffs**, <br><br> v. <br><br> **KODY KINSLEY**, in his official capacity as Secretary of the NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES ("DHHS"), <br><br> **Defendant**. | **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     This action seeks to end ongoing discrimination by the North Carolina

Department of Health and Human Services ("DHHS") against children with disabilities

placed in child welfare custody ("foster care") who are unnecessarily segregated from

their home communities and routinely isolated in heavily restrictive, and often clinically

1

inappropriate, institutional placements known as psychiatric residential treatment facilities ("PRTFs").

2.     On any given day, hundreds of children with disabilities in DHHS custody remain confined inside PRTFs, away from their communities. A material percentage of these children would be better – and far more cost-effectively – supported with integrated community-based and family-based placements (housing) and services, including mental and behavioral health services.

3.     DHHS can support clinically appropriate, less restrictive placements, but nonetheless spends excessive resources isolating children with disabilities in PRTFs. This exact practice was recently called out by a state representative who stated: "[North Carolina] [is] ruining people's live, and we're doing it in the most expensive way possible . . . . It's inhumane and irresponsible. It is a government failure."

4.     PRTFs are designed to provide intensive, short-term, residential psychiatric treatment for temporary stabilization. They are generally unsuitable as a long-term "place to live," but that does not stop DHHS from allowing children to languish there for extended periods of time. Unsurprisingly, research shows that children with disabilities confined to PRTFs suffer much worse outcomes than non-institutionalized children. These outcomes include spending longer periods of time in child welfare custody without a permanent home; losing critical family connections with parents, siblings, and extended family due to their confinement; and experiencing higher rates of maltreatment while in child welfare custody.

5.     Moreover, children with disabilities in foster care regularly face trauma within PRTFs. They are often confined to prison-like settings under the care of a poorly trained and understaffed workforce, where they are subject to broken bones, sprains, bruises, and dangerous physical and chemical restraints; withstand sexual and physical abuse, bullying, and hate speech by both youth and staff; and face mental health deterioration and cocktails of strong psychotropic medications. For instance, the Named Plaintiff children in this litigation, referred to by the pseudonyms Timothy B., Flora P., Isabella A., and Steph C., are all receiving heavy cocktails of mind-altering psychotropic medications while at North Carolina PRTFs. Flora P., Isabella A., and Steph C. have been subject to physical restraints; Timothy B. has faced bullying by staff; Isabella A. has been the target of bullying and sexual harassment; and Steph C. has been airlifted to a hospital after a physical attack knocked him unconscious. Despite these known dangerous conditions, DHHS sent at least 572 children in foster care to PRTFs in fiscal year 2020 to 2021.

6.     Children of color, such as Named Plaintiffs Flora P. and Steph C., bear the brunt of these harms. Black and Brown children are disproportionately represented in DHHS's foster care system in the first instance. And once in the system, Black and Brown children with disabilities are disproportionately confined to PRTFs. According to DHHS data from fiscal year 2019 to 2020, Black and Brown (including multiracial) children make up more than 40% of the children on Medicaid confined to PRTFs. When you include children identified as "other," that number jumps to almost 50%.

3

7. DHHS has long been aware of the intolerable conditions and other harms that children face within PRTFs. DHHS conducts regular oversight and monitoring of PRTFs and catalogues in public reports the substantial abuse and neglect occurring there. Yet DHHS keeps spending millions of taxpayer dollars to send children in child welfare custody to PRTFs, the very children they are in charge of protecting.

8. Not only are children in foster care in North Carolina routinely sent to PRTFs unnecessarily, more than a third of those children are sent into PRTFs out of state. DHHS ships children of all ages as far away as Utah, Missouri, and Indiana – too far for their caseworkers to keep an eye on their safety or for their families to visit them.

9. Overwhelmingly, the children DHHS warehouses in PRTFs would be better served by community placements and, in many instances, should never have been placed in a PRTF at all. They can – and should – be living within and treated within their communities, in family or family-like homes, near their schools and service providers.

10. A recent USA Today investigation uncovered that North Carolina children in foster care "were confined to [lockdown psychiatric] facilities round-the-clock despite a clinician determining that it was not medically justified, according to a consultant document and interviews . . . [because] there was nowhere else to put the youngsters. So they locked them away in institutions with strip searches and limited academic programs," a common "practice [that is] a consequence of the failures in North Carolina's foster care system."

11. North Carolina child welfare administrators admitted to USA Today, while maintaining anonymity for fear of retribution, that a major reason to unnecessarily place

4

children in PRTFs is the lack of available family settings to care for them. "County social service offices have paid to send children to psychiatric residential treatment facilities — an option that is supposed to be reserved for kids with severe mental and behavioral problems — even when clinicians recommended against such therapy, they said."

12.     DHHS's unnecessary institutionalization of children with disabilities is exactly the sort of unlawful discrimination prohibited by Title II of the Americans with Disabilities Act under the Supreme Court's landmark *Olmstead* decision, as well as by Section 504 of the Rehabilitation Act of 1973. *See Olmstead v. L.C.*, 527 U.S. 581 (1999). DHHS is legally obligated to administer its services, programs, and activities to children with disabilities in the most integrated setting appropriate to their needs, 28 C.F.R § 35.130(d), and is prohibited from unjustifiably institutionalizing and segregating children in PRTFs. *See Olmstead*, 527 U.S. at 587.

13.     DHHS's failure to provide community-based placement and treatment options for children and youth with disabilities in foster care fuels its overreliance on PRTFs. Despite a cost of $100 million per year, DHHS has increased its reliance on psychiatric residential treatment facilities since 2010 – instead of building up and expanding appropriate community-based family placements (relative or kinship families and non-relative foster families) and supportive mental and behavioral health treatment services.

14.     While DHHS ostensibly offers an array of community-based placements and services, the availability of needed services is too limited, and DHHS does not ensure that children with disabilities in foster care can actually access existing services. For

5

instance, DHHS acknowledges the significant barriers to accessing services in North Carolina, such as shortages or waitlists for intensive in-home services, crisis intervention services, outpatient mental health and substance abuse services, and inadequate transportation to and from such services. In light of their insufficient community-based options, DHHS unnecessarily sends foster children to PRTFs to languish there for extended periods of time, and cycles children in and out of PRTFs – when DHHS should only use PRTFs in rare situations as short-term *treatment* and never as a place to live because it has nowhere else to put them.

15. The DHHS failure to expand its community-based placements and services for foster children and youth with disabilities is particularly confounding and disturbing because it is well-established that community-based placements are more effective, yield better outcomes for children, and are less costly.

16. According to a consultant hired by DHHS in 2020, "North Carolina spends a disproportionate amount of its resources on institutional and congregate care settings" and "spends more to serve individuals in congregate care settings than it spends on community-integrated service options." Use of community-based placements and services would alleviate the profound waste of North Carolina tax payer funds on harmful institutional settings that cost at least hundreds of dollars a day.

17. The DHHS placement and services crisis for children is so dire that it was reported in September of 2022 that local Division of Social Services ("DSS") offices, agents of DHHS, are "boarding children in their offices or leaving children with emotional and behavioral health needs in emergency rooms after hospitals have released

6

them because there was nowhere else to place them" and, according to one high-level DHHS official, "their appropriate level of placement has not been located." The official went on to acknowledge that North Carolina's child welfare system "is in crisis" and "at any point there could be a massive class-action lawsuit."

18.     This civil rights action seeks only declarative and prospective injunctive relief on behalf of Named Plaintiff children Timothy B., Flora P., Isabella A., and Steph C. through their Guardians ad Litem Robert Ward, Esq. and Dr. Jeffrey C. Holden, Ph.D., and a class of similarly situated North Carolina youth with mental impairments in foster care ("the putative class"), as well as Associational Plaintiffs Disability Rights North Carolina and the North Carolina State Conference of NAACP, for DHHS's violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et. seq.*, and their implementing regulations.

19.     Plaintiffs are North Carolina children with disabilities in foster care who have been removed from their families and communities and are placed in, or at serious risk of placement in, a PRTF. Often they have unnecessarily spent much of their childhood languishing in these facilities, despite yearning to be in the community. By being unnecessarily confined to these facilities, they have been denied essential opportunities for healthy childhood development, such as living in a loving, supportive, family setting with community-based services, building intimate relationships with trusted adults, exploring chosen passions and hobbies, and developing necessary independent living skills. They also miss out on educational, employment, and social

7

opportunities with their nondisabled peers. In short, DHHS – the very agency that exists

to support and protect these children – is denying them their childhood.

20.     Plaintiffs challenge DHHS's systemic failures to ensure that children with

disabilities in foster care are cared for in the most integrated community-based setting

appropriate to their needs, and that children in PRTFs are timely and appropriately

discharged to such settings. Plaintiffs seek to remedy DHHS's ongoing statutory

violations on behalf of children who are entitled to be, and deserve to be, safely cared for

in their communities.

## JURISDICTION AND VENUE

21.     This class action for declaratory and prospective injunctive relief only is

brought to address Defendant's ongoing deprivations of rights guaranteed by federal

statutory law under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§§ 12131-12134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

22.     The Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (civil rights jurisdiction).

23.     Plaintiffs' claims for declaratory and injunctive relief are authorized by

28 U.S.C. §§ 2201 and 2202 as well as Rules 57 and 65 of the Federal Rules of Civil

Procedure.

24.     Venue is appropriate in the United States District Court for the Middle

District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part

of the events and omissions giving rise to the claims herein occurred in this District. For

instance, one Named Plaintiff is currently unnecessarily confined to a facility located in Hoke County, located in this District. Two Named Plaintiffs are in the custody of Defendant's agents in Montgomery County and Orange County, both of which are located in this District. Further, Defendant's agents maintain places of business in this District.

## PARTIES

### I. Disability Rights North Carolina as Associational Plaintiff

25. Plaintiff Disability Rights North Carolina ("DRNC") is an independent non-profit corporation organized under the laws of the State of North Carolina with offices in the State of North Carolina located at 3724 National Drive, Suite 100, Raleigh, N.C. 27612.

26. DRNC is a Protection and Advocacy system ("P&A"), as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15041 *et seq.*; the Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. § 10801 *et seq.*; and the Protection and Advocacy of Individual Rights Act, 29 U.S.C. § 794e *et seq.*

27. As the P&A for the state of North Carolina, DRNC is specifically authorized, and its primary function is, to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i).

Case 1:22-cv-01046-WO-LPA   Document 1   Filed 12/06/22   Page 9 of 73

28.     All people with disabilities in North Carolina, including the individual Named Plaintiff children and members of the putative class in this action, are constituents of DRNC and have standing to sue in their own right.

29.     Pursuing and protecting the rights of children with disabilities to live and receive services in the community and to be free from abuse and neglect is germane to DRNC's purpose.

30.     In this case, Plaintiff DRNC challenges Defendant's patterns, customs, policies, and/or practices, and the resulting discriminatory and unnecessary segregation and institutionalization of children with disabilities in foster care in PRTFs. Plaintiff DRNC seeks solely declarative and prospective injunctive relief, and no individual remedies.

31.     DRNC is accountable to members of the disability community. DNRC maintains a governance structure that ensures the P&A is reflective of and responsive to the disability community. *See* 42 U.S.C. § 15043 (detailing program requirements); 42 U.S.C. § 10805 (detailing program requirements); 34 C.F.R. § 381.10(a) (detailing program requirements). More than half of DRNC's board of directors and advisory council members are individuals with disabilities or family members, guardians, or advocates for individuals with disabilities. DRNC conducts annual surveys of the disability community to determine the specific areas of advocacy on which the organization will focus. Members of the disability community have the right to file grievances if they disagree with actions taken by DRNC or are wrongly denied services by DRNC.

10

## II. North Carolina State Conference of NAACP as Associational Plaintiff

32.     Plaintiff North Carolina State Conference of NAACP ("NC NAACP") is a grassroots and membership based nonprofit civil rights organization. The NC NAACP was established in 1938 as a state conference branch of the National Association for the Advancement of Colored People ("NAACP"), a national civil rights organization. It is the oldest and largest civil rights organization in North Carolina, with nearly 100 active branches in urban and rural communities throughout the state.

33.     The NC NAACP's mission is to ensure the rights of all persons to equality and to eliminate racial discrimination. It dedicates significant organizational resources to protecting and advancing civil rights and racial justice for African Americans, people of color, and other groups of people historically denied those rights in North Carolina.[1]

34.     Protecting the rights of children of color in foster care to live and receive services in their communities, rather than unnecessarily confined to PRTFs, and be free from all forms of discrimination, including unnecessary segregation and denial of community-based placements and supportive services, is germane to NC NAACP's purpose. The national NAACP has also stressed the urgency of addressing the overrepresentation of African American children in the foster care system and ensuring

---

[1] This has included, for instance, regularly engaging in voting equality efforts to ensure that African American children are not victims of racial discrimination or disproportionality, afforded equal protection under the law, and are not discriminated against by government agencies.

Case 1:22-cv-01046-WO-LPA   Document 1   Filed 12/06/22   Page 11 of 73

that they receive equal and necessary health services, including community-based mental health services.

35.     In this case, Plaintiff NC NAACP challenges Defendant's patterns, customs, policies, and/or practices—and the resulting discriminatory and unnecessary segregation and institutionalization of children with disabilities in foster care in PRTFs— which violates their rights under the ADA and Rehabilitation Act.

36.     African American and children of color within the putative class, such as Flora P. and Steph C., are constituents of NC NAACP.

37.     The NC NAACP also has over 20,000 paid members who registered, on behalf of themselves and their families, to stand up against racial disparities. This is the largest number of members of any NAACP state conference in the South, and the second largest in the country. Named Plaintiffs Timothy B., Flora P., and Steph C. are youth members of the NC NAACP.

38.     Named Plaintiffs who are constituents and members of NC NAACP have standing to sue in their own right. These Named Plaintiffs suffered harms that result from and are traceable to the conduct and inaction of DHHS. Guardian ad Litem Robert Ward is a member of the NC NAACP, and Guardian ad Litem Dr. Holden is a member of the NAACP.

39.     Many of NC NAACP's members are also actively engaged as parents, family members, and informal family members, such as God-parents or community parents, of children who are presently in foster care placements. Some of these children

12

have, in the past and/or presently, been unnecessarily placed in harmful PRTFs or remain at risk of such placement due to Defendant's failures.

40.     For these reasons, the NC NAACP is uniquely situated to seek legal protections for African American children and children of racial minorities with disabilities who are or remain at risk of placement in PRTFs, and are unable to independently assert or seek legal protections or to provide the Court with information contextualizing the severity of the injury imposed by their unnecessary and segregated placement in these facilities.

## III.     Named Plaintiffs and Guardians ad Litem[2]

### A.  Named Plaintiff Timothy B.

41.      Timothy B. is a 14-year-old child with disabilities in the custody of DHHS's agent, Robeson County DSS, who is unnecessarily institutionalized in a PRTF.

42.     Timothy B. is a member of the Lumbee Tribe of North Carolina and a youth member of the NC NAACP.

43.     Timothy B. is a constituent of DRNC.

44.     Timothy B. has DSM-V diagnoses that substantially limit one or more major life activity, including self-care, learning, concentrating, thinking, interacting with others, and the operation of the major bodily function of the brain.

---

[2] The Named Plaintiffs' names listed in this complaint are pseudonyms to protect their identities. Plaintiffs are filing a motion contemporaneously herewith seeking permission to use these pseudonyms in the litigation. Plaintiffs are also filing a Motion for Appointment of Guardians ad Litem contemporaneously herewith.

Case 1:22-cv-01046-WO-LPA   Document 1   Filed 12/06/22   Page 13 of 73

45.     When he was very young, DHHS removed Timothy B. from his mother's house. In or around 2019, Timothy B. moved from his father's home and returned to his mother's house.

46.     In February of 2020, agents of DHHS placed Timothy B. at a PRTF in Raeford, NC. Now, almost three years later, he continues to live in that PRTF in deplorable conditions, through the present. Timothy B.'s room is totally bare, with only a green pad as a mattress, no mattress cover, one pillow, and a blanket. There is no furniture in his room. Timothy B. has nowhere to keep private paperwork and has had staff throw out items that were important to him.

47.     The PRTF is primarily made up of one common room, where children spend almost all of their time. Children eat all of their meals, attend school, meet with visitors, and do all of their socializing in the same small room.

48.     Timothy B. has been placed on a powerful cocktail of psychotropic medications while at the PRTF. He is subject to polypharmacy, which is an outlier prescription practice that consists of the concurrent administration to children of multiple psychotropic medications. He is currently taking Prozac, Risperdal, and other medications he cannot name.

49.     Timothy B. has been the target of bullying from staff while at the PRTF, including being called "crybaby," "b*tch," and other derogatory terms.

50.     While at the PRTF, it took months before Timothy B. received a psychological evaluation.

14

51.     As a child in the custody of child welfare, Timothy B. is categorically eligible for Medicaid-funded services in the community and may be eligible for additional state-funded services.

52.     Placement in the community with community-based mental and behavioral health services is appropriate for Timothy B.

53.     Timothy B. receives one short individual therapy session per week at which Timothy B. and his therapist typically talk through a worksheet. Timothy B. also meets with a psychiatrist for about 15 minutes once a week on Tuesdays. These services can be provided in the community.

54.     The PRTF has repeatedly talked with Timothy B. about transitioning him to a lower level of care but also tells him at his monthly child and family team meetings that "nobody's accepting you, see you again next month."

55.     Timothy B. has repeatedly stated that he does not feel safe at the PRTF.

56.     While Timothy B. has been at the PRTF, DHHS has cited the facility for failing to ensure that youth receive judicial review hearings to which they are statutorily entitled. DHHS also found that staff cursed at and picked on the residents, that one staff member had a former conviction of assault with a deadly weapon with intent to kill, and that one staff member was suspended for talking about guns and drinking within earshot of residents.

57.     Timothy B. has expressed multiple times that he wishes to leave the PRTF and live with his grandmother. At a recent child and family team meeting, when he was asked "what's not working," he said, "I'm still at the PRTF."

15

58.     Timothy B. wants to live in the community with appropriate services and supports. He would like to participate in normal, adolescent activities such as playing sports, shopping, being with family, and going to a grocery store. But he is forced to live a regimented and segregated life at the PRTF. He is restricted from attending school in the community or interacting with nondisabled peers.

59.     DHHS can accommodate Timothy B. in the community through its existing array of home and community-based placements and services.

60.     Timothy B. brings this action through his Guardian ad Litem Robert Ward.

**B. Named Plaintiff Flora P.**

61.     Flora P. is a fifteen-year-old child with disabilities in the custody of DHHS's agent, Orange County DSS, who is unnecessarily institutionalized in a PRTF.

62.     Flora P. is African American and a youth member of the NC NAACP.

63.     Flora P. is a constituent of DRNC.

64.     Flora P.'s diagnoses include Post-Traumatic Stress Disorder ("PTSD"), Disruptive Mood Dysregulation Disorder ("DMDD"), and Attention Deficit Hyperactivity Disorder ("ADHD"). These diagnoses substantially limit one or more major life activity, including self-care, learning, concentrating, interacting with others, and the operation of the major bodily function of the brain.

65.     Flora P. was first in the foster care system as a toddler. She was adopted at age three but then reentered the child welfare system as a teenager, after her adoptive parents divorced and later abandoned her.

16

66. Flora P. is currently confined to a PRTF in Leland, NC, where she has been since February 2022.

67. While at the PRTF, Flora P. has been subject to polypharmacy. She is currently placed on a powerful cocktail of psychotropic medications, including Trazadone, Trileptal, and others she cannot recall. She has been subjected to both physical and chemical restraints that have physically harmed her.

68. As a child in the custody of child welfare, Flora P. is categorically eligible for Medicaid-funded services in the community and may be eligible for additional state-funded services.

69. Placement in the community with community-based mental and behavioral health services is appropriate for Flora P.

70. Flora P. was recommended for a Level III Group Home placement in the community about four months ago, but she has lingered at a PRTF because there is no opening for her in a Level III placement.

71. Flora P. wants to return to the community with appropriate services and supports. She would like to live with less people, and she hopes to have more privacy and autonomy. Her healthy coping mechanisms include spending time outside and alone, but she cannot freely do those things in a crowded, locked PRTF setting.

72. Because DHHS is confining Flora P. to a PRTF, she cannot participate in normal, adolescent activities that she enjoys, such as cooking for the homeless; baking cakes, cupcakes, and cookies; and pursuing her goal to become a businesswoman in the future.

73. DHHS can accommodate Flora P. in the community through its existing array of home and community-based placements and services.

74. Flora P. brings this action through her Guardian ad Litem Robert Ward.

## C. Named Plaintiff Isabella A.

75. Isabella A. is a 13-year-old child with disabilities in the custody of DHHS's agent, Montgomery County DSS, who is unnecessarily institutionalized in a PRTF.

76. Isabella A. is a constituent of DRNC.

77. Isabella A.'s diagnoses include PTSD, ADHD, and DMDD. These diagnoses substantially limit one or more major life activities, including self-care, learning, concentrating, interacting with others, and the operation of the major bodily function of the brain.

78. Isabella A. is in foster care in the care and custody of Montgomery County DSS.

79. Isabella A.'s childhood has been marked by instability. During her five years in foster care in DSS custody, DHHS's agent has shuffled Isabella A. among over 20 placements, including at least three highly restrictive PRTFs.

80. At one point in spring 2022, Isabella A. was without any placement and spent several days living and sleeping in the conference room of a DSS office. The office is not equipped or intended for children to stay in overnight; cots were brought in for children to sleep on, and Isabella A. had to walk to another building nearby to shower.

18

81.     Isabella A. is currently confined in a PRTF in Jacksonville, N.C., where she has been since July 2022.

82.     While at the PRTF, Isabella A. has been subject to a physical restraint and is currently subject to polypharmacy.

83.     The conditions at the PRTF can be punitive in nature, with many arbitrary rules that children would not experience in a family environment. Isabella A. has limited chances to engage in developmentally-appropriate activities that other adolescents regularly do, such as developing relationships with friends of her choosing; or freely engaging in her hobbies and coping mechanisms, such as coloring, drawing, listening to music, and playing cards. She can only spend limited amounts of time outside because she does not have enough warm winter clothes.

84.     At the PRTF, Isabella A. has been the target of bullying behavior, including painful sexual harassment, from peers. While Isabella A. has been at the PRTF, it has been cited by DHHS for staff failing to appropriately supervise children, such that suicide attempts, fighting, and serious injuries occur.

85.     As a child in the custody of child welfare, Isabella A. is categorically eligible for Medicaid-funded services in the community and may be eligible for additional state-funded services.

86.     Placement in the community with community-based mental and behavioral health services is appropriate for Isabella A. She was previously placed in several community-based TFC homes. At her most recent TFC placement, DHHS did not

19

provide timely therapy upon placement, intensive in-home services, or additional wrap around services to support her placement in the community.

87.     Isabella A. is currently receiving weekly individual therapy, bi-weekly family therapy with a DSS social worker and her attorney, "recreational" therapy on Wednesdays and Thursdays, and group therapy on Monday, Tuesday, and Friday – all of which can be provided in the community.

88.     Isabella A. wants to live in the community with appropriate services and supports and attend a traditional school. She has repeatedly expressed a desire to be freed from the PRTF, as she believes the confinement is not only unhelpful, but actively harmful.

89.     DHHS can accommodate Isabella A. in the community through its existing array of home and community-based placements and services.

90.     Isabella A. brings this action through her Guardian ad Litem Dr. Holden.

**D.  Named Plaintiff Steph C.**

91.     Steph C. is a 15-year-old child with disabilities in the care and custody of DHHS's agent, Craven County DSS, who is unnecessarily institutionalized in a PRTF.

92.      Steph C. is African American and a youth member of the NC NAACP.

93.     Steph C. is a constituent of DRNC.

94.     Steph C.'s diagnoses include PTSD, DMDD, Borderline Intellectual Functioning, ADHD, and Conduct Disorder. Steph C. is substantially limited in one or

more major life activities, including self-care, learning, and interacting with others and the operation of the major bodily function of the brain.

95.     Steph C.'s childhood has been marked by instability due to DHHS's agents' failure to provide an appropriate placement and services for him. In the eight years since his removal due to alleged domestic violence and physical abuse, DHHS's agents have shuffled him through over 50 different placements. These placements have included several group homes and at least 7 different PRTFs throughout the state.

96.     Steph C. is currently confined to a PRTF in Kinston, N.C., where he has been since April 2022.

97.     While at the PRTF, Steph C. has been subject to repeated physical abuse by peers and has suffered at least two serious head injuries. Steph C. was airlifted to a hospital trauma center after another youth at the PRTF slammed his head to the ground, causing him to lose consciousness. On a separate occasion, Steph C. suffered a head injury from an assault by another youth at the PRTF and ended up in the Emergency Room. Staff at the PRTF have since moved Steph C. to a unit with much younger children, ostensibly for his safety.

98.     Steph C. has also been subjected to physical restraints and polypharmacy while at NOVA. He is on a powerful cocktail of multiple psychotropic medications.

99.     As a child in the custody of child welfare, Steph C. is categorically eligible for Medicaid-funded services in the community and may be eligible for additional state-funded services.

100. Placement in the community with community-based mental and behavioral health services is appropriate for Steph C.

101. The PRTF has told Steph C. of plans to discharge Steph C. to a lower level of care multiple times, but he has remained at the facility.

102. Agents of DHHS have sought to place Steph C. in a community-based setting; they have initiated the Interstate Compact on the Placement of Children process to place him out-of-state with is biological aunt.

103. Steph C. has previously lived in several different community-based placements with community-based treatment, such as outpatient therapy and intensive in-home therapy. Steph C. had an over one-year period of stability living with a foster parent in a specialized therapeutic foster home.

104. Steph C. wants to live in the community with appropriate services and supports. He has repeatedly expressed a desire to live in a family home with his biological aunt.

105. DHHS can accommodate Steph C. in the community through its existing array of home and community-based placements and services.

106. Steph C. brings this action through his Guardian ad Litem Dr. Holden.

**E. Guardian ad Litem Robert Ward**

107. Pursuant to FED. R. CIV. P. 17(c)(2) and Local Rule 17.1, Named Plaintiffs Timothy B. and Flora P. bring this action through their Guardian ad Litem Robert Ward, Esq.

108.    Robert Ward has served as an assistant public defender in North Carolina for over 36 years. Many of his clients are people with mental and behavioral health disabilities, including children with mental and behavioral health disabilities.

109.    Robert Ward has met with each of the Named Plaintiffs he seeks to represent, Timothy B. and Flora P. He is familiar with Timothy B.'s and Flora P.'s circumstances, the harms and risks of harms Timothy B. and Flora P. face while in foster care and in PRTFs, and the claims in this litigation.

110.    He is dedicated to serving Timothy B.'s and Flora P.'s best interests in this litigation. Mr. Ward is able to represent and act upon the best interests of Timothy B., Flora P., and the putative class without any conflict or bias.

**F.  Guardian ad Litem Jeffrey C. Holden, Ph.D.**

111.    Pursuant to FED. R. CIV. P. 17(c)(2) and Local Rule 17.1, Named Plaintiffs Isabella A. and Steph C. bring this action through their Guardian ad Litem Jeffrey Holden, Ph.D.

112.    Dr. Holden is a retired psychologist in North Carolina whose practice was devoted to the care and treatment of individuals with disabilities.

113.    Dr. Holden has met with each of the Named Plaintiffs he seeks to represent, Isabella A. and Steph C. He is familiar with Isabella A.'s and Steph C.'s circumstances, the harms and risks of harms Isabella A. and Steph C. face while in foster care and in PRTFs, and the claims in this litigation.

23

114.    Dr. Holden is dedicated to serving Isabella A.'s and Steph C.'s best interests in this litigation. Dr. Holden is able to represent and act upon the best interests of Isabella A., Steph C., and the putative class without any conflict or bias.

IV.    **Defendant**

115.    Kody Kinsley is the current Secretary of the North Carolina Department of Health and Human Services and is sued in his official capacity only.

116.    According to DHHS, "as Secretary, Kinsley oversees a department that has broad responsibility for all aspects of health and human services, a staff of 18,000 and an annual budget of $26 billion."

117.    DHHS and Secretary Kinsley in his official capacity are legally responsible for compliance with the ADA and Rehabilitation Act for the Plaintiffs and putative class, including for the policies, customs, patterns, and practices alleged in this complaint.

118.    DHHS is a principal department of the North Carolina Executive Branch with wide-ranging functions, powers, duties, and obligations. DHHS, by and through its various divisions, oversees and operates all aspects of the North Carolina child welfare system. The DSS (Division of Social Services) within DHHS supervises and provides technical assistance to county DSS offices, which make placement decisions for youth in foster care, including PRTF placement. The Division of Health Services Regulation ("DHSR") within DHHS monitors and oversees all licensed mental health facilities in North Carolina, including PRTFs. DHHS administers North Carolina's statewide Medicaid program ("NC Medicaid") through its Division of Health Benefits. DHHS also

24

oversees mental health and developmental disability services, including treatment at PRTFs, through its Division of Mental Health, Developmental Disabilities, and Substance Abuse Services ("DMH/DD/SAS"). This division is also responsible for ensuring that high-quality mental health and developmental disability services are available to people that need them. The DMH/DD/SAS division contains the statutorily-created Commission for Mental Health, Developmental Disabilities and Substance Abuse Services, which has the authority to adopt and repeal rules pertaining to all mental health programs, including operating standards for licensed mental health facilities such as PRTFs.

119.    DHHS has non-delegable direct and ultimate responsibility for the care, conditions of custody, placement, and services for all North Carolina youth in foster care, including the Named Plaintiffs and all members of the putative class.

120.    Secretary Kinsley enjoys broad statutory authority over DHHS, including the ability to create and eliminate subdivisions within his department and direct departmental responsibilities to any of his subordinates.

121.    Secretary Kinsley has supervision, direction, and control over all DHHS employees.

122.    Secretary Kinsley has the power to create or eliminate positions; make appointments to, and remove persons from, such positions; transfer officers and employees between positions; and change existing positions' duties, titles, and compensation.

123. Secretary Kinsley is responsible for all DHHS managerial functions, including planning, organizing, staffing, coordinating, reporting, and budgeting. To that end, he must prepare and present to the governor an annual report on DHHS's work, DHHS's planned work for the coming year, and DHHS's budget request.

124. Secretary Kinsley is statutorily responsible for supervising the regional- and county-level administration of North Carolina's child welfare system through local DSS at the county level. For instance, DHHS must supervise each county's board of social services' establishment of policies. Each county director of social services – who, among other things, accepts children for placement and supervises placements – "act[s] as [an] agent of . . . [DHHS] . . . in relation to the work required by . . . [DHHS]."

125. Secretary Kinsley also has authority to "adopt and enforce rules" applicable to local DSS offices. This includes rules related to "the placement of individuals in licensable facilities located outside the individual's community and [the] ability of the providers to return [them] . . . to [their] community as soon as possible without detriment," and "the monitoring of mental health [and] developmental disability . . . services."

126. Secretary Kinsley has acknowledged the need to improve North Carolina's mental health system and provide more support to children in DHHS's care, "specifically around kids that are engaged in the foster care system." He told lawmakers in June 2022 that "[u]nfortunately, our children and the behavioral health needs of our kids have languished in our state for far too long."

127. DHHS and its agents maintain offices in all counties located in this District.

26

## CLASS ACTION ALLEGATIONS

128.    Named Plaintiffs Timothy B., Flora P., Isabella A., and Steph C. bring this action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and a putative class of similarly situated children.

129.    <u>Putative Class</u>: All Plaintiffs seek to represent a Class defined as all children that meet the following criteria now or during the pendency of this action:

> (a) children who are or will be in North Carolina foster care,[3] who are or will be in the custody of a North Carolina county department of social services;[4] (b) with a mental impairment that substantially limits at least one major life activity, or a record of such an impairment; (c) who are unnecessarily institutionalized in a PRTF or who are at serious risk of such institutionalization.[5]

130.    Numerosity. The putative class is sufficiently numerous to make joinder of all its members impracticable. During North Carolina's Fiscal Years 2018 to 2022, there were at least 1,900 paid Medicaid claims to place North Carolina children in foster care in PRTFs. State data shows that as of November 2021, over a one-year period, 572 children involved with North Carolina's child welfare system were placed in PRTFs. This represents an increase compared to previous years. The increase is compounded by the ongoing lack of adequate community-based treatment and services available in North Carolina. These factors mean that even more children in foster care are at risk of future placement in PRTFs.

---

[3] *See* N.C. Gen. Stat. § 7B-903(a)(6).
[4] *See* N.C. Gen. Stat. § 7B-101(8a).
[5] Children at serious risk of unnecessary institutionalization in a PRTF include children with a mental health or behavioral health diagnosis(es) who, for instance, were previously institutionalized or placed in a restrictive care setting such as a PRTF.

131.    Additionally, children in foster care in North Carolina move with extreme frequency among placements, including in and out of PRTFs and from PRTF to PRTF. This makes joinder of all class members even more impractical because of the fluid and inherently transitory nature of the putative class members' experience in child welfare custody. For instance, Named Plaintiff Isabella A. has been shuffled among over 20 placements during her five years in foster care, and Named Plaintiff Steph C. has experienced over 50 different placements over the past eight years, including at least 7 PRTF placements. From 2015 to 2016, youth in foster care in North Carolina experienced 2.1 placements moves per 1,000 days in care. In 2019, North Carolina's rate of placement moves per 1,000 days in foster care was over 5.9 moves, worse than the national performance standard of 4.1.

132.    Thus, as a result of this instability and the lack of sufficient community-based placements and supportive services, and as set forth herein, many additional children with disabilities in foster care are at serious risk of placement in PRTFs.

133.    Joinder is also impracticable because Class members lack the knowledge and financial means to maintain individual actions.

134.    Commonality. The common questions of law and fact shared by the Named Plaintiffs and the putative class they seek to represent include:

a. Whether Defendant has a pattern, custom, policy, and/or practice of administering its programs in a manner that results in the unnecessary segregation of children in the putative class in PRTFs.

28

b.  Whether Defendant has a pattern, custom, policy, and/or practice of administering its programs in a manner and through methods that result in the unnecessary segregation of children in the putative class by failing to plan for, develop, operate, and fund a sufficient array of community-based supports, including community-based placements and supportive mental and behavioral health services, for children in foster care and their caregivers that would allow children in the putative class to live in integrated settings.

c.  Whether Defendant has a pattern, custom, policy, and/or practice of administering its programs in a manner and through methods that result in the failure to transition or timely transition children in the putative class out of PRTFs and into stable, integrated community-based placements when they are ready for discharge.

d.  Whether Defendant's patterns, customs, policies, and/or practices with respect to the putative class violate Title II of the Americans with Disabilities Act.

e.  Whether Defendant's patterns, customs, policies and/or practices with respect to the putative class violate Section 504 of the Rehabilitation Act.

135.  Typicality. The claims of the Named Plaintiffs are typical of the legal violations and harms suffered by all Class Members. The Named Plaintiffs are members

29

of the putative class who have been confined to PRTFs despite the appropriateness of community-based placements and services and their desire to be treated in the community. They are also all subject to or at serious risk of being subjected to the patterns, customs, policies and/or practices identified in this complaint with respect to the putative class. The Named Plaintiffs are entitled to the same injunctive and declaratory relief that addresses these policies and practices for the putative class.

136.   Adequacy of Representation. The Named Plaintiffs will fairly and adequately protect the interests of the entire Class. The Named Plaintiffs are seeking only systemic relief that will benefit all members of the putative class. There are no known conflicts of interest between the Named Plaintiffs and the members of the putative class they seek to represent.

137.   The Guardians ad Litem Robert Ward and Dr. Holden are truly dedicated to representing the best interests of the Named Plaintiffs that they represent. The Guardians ad Litem are both familiar with the harms experienced by the Named Plaintiffs and the claims in this litigation.

138.   Plaintiffs' counsel are:

  a.   Attorneys from DRNC, North Carolina's federally mandated Protection and Advocacy agency;

  b.   Attorneys from Children's Rights, a national non-profit children's advocacy organization;

  c.   Attorneys from the NC NAACP, a North Carolina civil rights advocacy organization; and

30

d.  Attorneys from Moore & Van Allen, PLLC, a full-service law firm

headquartered in Charlotte, NC, acting as pro bono counsel.

139.  Plaintiffs' attorneys are well-suited to fairly and adequately represent the

interests of the putative class. These attorneys have experience litigating complex class

actions in federal court, including civil rights litigation and specific litigation with respect

to the foster care system, disabilities, and government system failures. Plaintiffs'

attorneys have also committed sufficient resources to represent the putative class.

140.  As detailed throughout this complaint, the Defendant has acted or refused

to act on grounds generally applicable to the putative class, thereby making final

injunctive and declaratory relief appropriate with respect to the putative class as a whole

under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

141.  The injuries of the putative class can be redressed by a single injunctive and

declaratory judgement that declares DHHS's conduct unlawful and orders DHHS to: end

its unlawful methods of administration and unnecessary segregation of children with

disabilities in foster care in PRTFs; increase its capacity to serve the needs of children

with disabilities in foster care in community-based placements with mental and

behavioral health services in the community; and timely transition children in foster care

placed in PRTFs out of PRTFs into community-based placements with supportive

services.

# FACTUAL ALLEGATIONS

## V. Defendant Has Responsibility for Administering and Overseeing All Aspects of the Child Welfare System in North Carolina

142.    DHHS is the designated single state agency responsible for administering and overseeing all child welfare services in North Carolina. 42 U.S.C. § 621; N.C. Gen. Stat. § 108A-71 & -74.

143.    DHHS "is responsible for ensuring the health, safety and well-being of all North Carolinians."

144.    DHHS also "manages the delivery of health- and human-related services for all North Carolinians, especially [its] most vulnerable citizens – children."

145.    DHHS is required by federal law to administer all of its services and programs to children in the state in a manner that does not discriminate against children with disabilities. *See* 28 C.F.R. § 35.130(b); 45 C.F.R. § 84.4(b)(4).

146.    DHHS has the direct, ultimate, and non-delegable duty to comply with federal statutory obligations under Title II of the ADA and Section 504 with respect to all children with disabilities in foster care, including the putative class. As a practical matter, DHHS delegates to its county DSS offices many of its day-to-day child welfare functions, while continuing to directly oversee these functions in a number of ways. Each county director of social services is the statutorily appointed agent of DHHS for all child welfare related work carried out in the county. N.C. Gen. Stat. § 108A-14(a). DHHS therefore directs, controls, and is liable for the acts and omissions of county departments of social services, who act as DHHS's agents in the delivery of services to children in foster care,

32

specifically in arranging for placements and the delivery of services as alleged in this complaint.

147. DHHS must take over the provision of child welfare services when its agents do not meet their obligations or fail to provide child welfare services in accordance with state law. N.C. Gen. Stat. § 108A-74(a3)-(c1), (c) & (h). DHHS has exercised this power as recently as May 2022.

148. North Carolina's provision of services to children removed from their homes and placed in state custody by its child welfare agents, as well as other child welfare services, are financed in part by federal funds distributed under Title IV-E of the Social Security Act. As of 2018, these funds financed 42% of North Carolina's child welfare spending.

149. To maintain eligibility for such federal funds, North Carolina must have a State Plan for administering its foster care system that complies with federal law and designate a state agency responsible for the administration of the plan.

150. The North Carolina State Plan includes, among other things, the state's strategies for:

    a. identifying and treating mental health needs of children in foster care;

    b. guaranteeing that children in foster care are not inappropriately diagnosed and institutionalized;

    c. ensuring the appropriate use of medication for children in foster care; and

    d.  guaranteeing face-to-face visits by social workers with children in foster

care at least monthly that are focused on the child's safety, permanency,

and well-being. 42 U.S.C. § 622.

151.    As the designated single state agency under Title IV-E, DHHS must ensure

that the State Plan is "in effect in all political subdivisions of the State, and, if

administered by them, be mandatory upon them," as well as "monitor and conduct

periodic evaluations" of the foster care program.

152.    In addition to the explicit principal-agent relationship established by N.C.

Gen. Stat. § 108A-14(a), North Carolina statutes outline a separate scheme by which

DHHS monitors the counties' provision of social services. Each year, the Secretary of

DHHS must require all county departments to enter written performance agreements that

specify mandated performance requirements and administrative responsibilities regarding

social service programs, including child welfare. N.C. Gen. Stat. § 108A-74. These

agreements allow DHHS to withhold funds from the county office if it cannot satisfy

mandated performance requirements or otherwise comply with the terms of the

agreement or applicable law. N.C. Gen. Stat. § 108A-74(a3), -74(a2)(4). If a local

department cannot comply with the terms of the agreement, the mandated performance

measures, or other applicable law, DHHS and the local department must enter a joint

corrective action plan. N.C. Gen. Stat. § 108A-74(a3). If a local department cannot

complete the corrective action plan, the Secretary of DHHS may temporarily assume all

or part of the local department's services administration. N.C. Gen. Stat. § 108A-74(b).

DHHS can withhold funds if it determines that a local department is not providing foster

34

care services in accordance with state law and the "failure to provide the services poses a substantial threat to the safety and welfare of children in the county who receive or are eligible to receive the services." N.C. Gen. Stat. § 108A-74(h). These agreements between DHHS and their county DSS agents require DHHS and its agents to provide child welfare services in compliance with all applicable federal and state laws, rules, regulations, and policies.

153.    DHHS must also file an annual report to the legislature on its oversight of local social services programs, including foster care.

154.    Compliance with federal and state law requirements for children in foster care include:

   a.  Making reasonable efforts, absent an immediate threat of harm, to prevent the removal of a child and need for placement elsewhere. *See* 42 U.S.C. § 671(a)(15)(B); 45 C.F.R. § 1356.21(b); N.C. Gen. Stat. § 7B-507;

   b.  Making efforts to place children with relatives, nonrelative kin, former foster parent(s), or other persons in the child's home community. *See* 42 U.S.C. § 671(a)(29); N.C. Gen. Stat. § 7B-505; and

   c.  Making arrangements for psychiatric, psychological, or mental health care or treatment and psychotropic medications that are in the child's best interest. *See* 42 U.S.C. § 622(b)(15)(A); N.C. Gen. Stat. § 7B-505.1.

155.    DHHS is also responsible for the oversight and regulation of all licensed facilities throughout the state, including all PRTFs and other facilities providing care for children. N.C. Gen. Stat. § 122C-27.

156.    DHHS's oversight responsibility includes inspecting PRTFs on at least an annual basis and whenever it otherwise deems inspection necessary. DHHS must also conduct unscheduled inspections of any facility subject to a complaint alleging the violation of a PRTF licensing rule. And it must submit an annual report to the legislature detailing compliance of each facility with laws and rules governing the use of restraints and seclusion, as well as facility deaths.

157.    DHHS has authority to deny, suspend, amend, or revoke licenses of PRTFs; investigate allegations of harm occurring at PRTFs; inspect facilities; require regular reporting; impose financial penalties; limit or suspend admissions to PRTFs; remove children from PRTFs; and refuse to place children at PRTFs.

## VI.    Defendant Discriminates Against Children with Disabilities in Foster Care by Unnecessarily Segregating Them in PRTFs

158.    The ADA recognizes that "society has tended to," and problematically "continue[s] to," "isolate and segregate individuals with disabilities." 42 U.S.C. § 12101(a)(2). Thus, regulations passed by Congress implementing Title II of the ADA require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). According to the preamble discussion of the regulations, the "most

36

integrated setting" means "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. B. Public entities must also "make reasonable modifications in [their] policies, practices, or procedures" to avoid disability-based discrimination. 28 C.F.R. § 35.130(b)(7).

159.    Regulations implementing Title II of the ADA further prohibit public entities from utilizing "criteria or methods of administration" "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination" or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3); *accord* 45 C.F.R. § 84.4(b)(4) (Rehabilitation Act).

160.    In the seminal decision *Olmstead v. L.C.*, 527 U.S. 581 (1999), the United States Supreme Court held that unnecessary institutionalization can constitute unlawful discrimination under the ADA. Under *Olmstead*, states must provide community-based treatment for individuals with disabilities when 1) such placement is appropriate, 2) the affected persons do not oppose such treatment, and 3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with disabilities. *See id.* at 607. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, imposes identical requirements on programs and activities that receive federal financial assistance. *See, e.g.*, 45 C.F.R. § 84.4(b)(2).

161.    Defendant has a pervasive, system-wide practice of unnecessarily segregating children in its care in PRTF institutions instead of providing care and placement for them in their communities. Defendant is discriminating against youth with

37

disabilities in foster care by administering and funding its child welfare programs and services for these youth in a manner that results in their unnecessary institutionalization or serious risk of such institutionalization. By failing to provide placements, services, and supports that enable youth with disabilities in foster care to remain in their own homes or in integrated family-like settings in the community, Defendant has violated Title II of the ADA and its implementing regulations.

162.    DHHS and its county DSS agents are responsible for providing children in foster care with a safe, appropriate home and for making arrangements for the appropriate care and treatment of their mental health needs.

163.    According to state law, DHHS and its county DSS agents are specifically required to prioritize placement of children in foster care in the community, in families rather than in institutions. They also must provide them with community-based mental and behavioral health services.

164.    Instead, DHHS has an ongoing policy, practice, pattern, and/or custom of inappropriately and unnecessarily segregating children with disabilities in foster care in PRTFs, rather than placing them in integrated community-based placements with supportive services.

165.    Other youth in foster care with mental impairments are at serious risk of entering or returning to a PRTF because of DHHS's systemic and pervasive failure to provide adequate, appropriate community-based services, as well as its ongoing practices of unnecessarily segregating children in foster care in PRTFs and cycling children in foster care through multiple PRTF placements.

38

166.   DHHS also places a substantial number of youth with disabilities in foster care in PRTFs located outside the state of North Carolina, far away from their families, existing community supports, and the agencies responsible for ensuring their safety. A USA TODAY Network investigation found that "abused and neglected children from North Carolina have been sent as far away as Utah, Missouri, Indiana and other states even when psychiatric facilities have been accused of physical and sexual abuse and other mistreatment." Further, USA TODAY reported that "[e]xperts say many families — often people of color who are struggling financially and living without reliable transportation — cannot visit or check on the well-being of kids" when placed out of state.

167.   As of November 2021, North Carolina officials report that approximately 40% of youth placed in PRTFs were sent to facilities in other states over a one-year period. During North Carolina's Fiscal Years 2018 to 2022, at least 726 Medicaid claims were paid for North Carolina children in foster care in PRTFs located outside the state.

168.   North Carolina has doubled-down on its overreliance of PRTFs. DHHS has increased its reliance on PRTFs at a rate of 119% from 2010 to 2018. As of November 2021, over 500 children involved with North Carolina's child welfare system were placed in PRTFs over a one-year period, which is more than in previous years.

169.   According to an April 2021 report by a consultant group hired by DHHS, "DHHS staff shared their perception that there is an overreliance on residential services for children with behavioral health needs, and that residential treatment facilities are viewed as a place for children to live, rather than as a level of treatment." Further,

"Division of Social Services (DSS) staff shared that children involved with the Child Welfare system sometimes remain in a PRTF long after a discharge plan is made because there is no identified placement available for them." The lack of appropriate community-based placements affects foster children with disabilities across placements and throughout the system: "DHHS also attributed the delay in discharges from state-run psychiatric hospitals to the lack of community-based behavioral health services, requiring people to wait in state hospital beds until the community services they needed became available."

170.    As the state's consultant summarized to DHHS, "[i]t is important to note that the state's use of PRTFs has increased, and further work should be done to strengthen access to community-based services to reduce out-of-home placements."

171.    DHHS's overreliance on congregate institutions is evidenced by its spending practices; more money is spent on PRTFs and other institutional care than on community-based programs, even though DHHS admits that community-based programs are "better at improving kids' lives."

172.    In 2020, DHHS requested that the Technical Assistance Collaborative ("TAC") provide an assessment of how DHHS serves people with disabilities. This consultant's report concluded that North Carolina spends a "disproportionate" amount of its resources on institutional settings and that "[a]dditional community-based service options and capacity are needed for children . . . to reduce reliance on institutional and congregate care settings."

## A. Children with Disabilities in Child Welfare Custody Are Warehoused in Restrictive PRTFs and Exposed to Harmful, Non-Therapeutic Conditions

173. PRTFs are locked, segregated, institutional facilities that are populated exclusively with children with disabilities. They necessarily deprive the children within their walls of opportunities to interact with non-disabled peers in a community-based, integrated setting.

174. Aside from limited opportunities to receive visits from family and friends, children confined to PRTFs have few opportunities to interact with anyone without a disability, other than staff. Children in PRTFs must attend on-site schools. As these on-site schools contain only children with disabilities, they are not integrated with their nondisabled peers. They are also denied the option of participating in community-based activities, such as recreation-league sports, dance classes, music lessons, part-time jobs, or school clubs. Instead, it is not uncommon for children's opportunities for free play and fresh air to be time spent within the confines of razor-wire-surrounded recreation yards, and for limited periods of time.

175. Daily life in a PRTF is typically regimented in a prison-like manner, dissimilar to life in the community and antithetical to healthy adolescent development. Children generally share rooms with at least one other peer, have little designated personal space, lack privacy, and are subject to invasive and traumatizing strip searches. For instance, Named Plaintiff Timothy B. spends most of his time in the one common room at the PRTF facility, has little-to-no privacy, and has nowhere to keep his personal belongings. Additionally, children are subjected to rigid, non-individualized behavior

41

management practices, rather than practices tailored to the child's individual needs and goals.

176.    In addition to the harms of segregation, children placed in PRTFs experience worse outcomes than their non-institutionalized peers. Social science research and evaluations of residential facilities and group homes have confirmed that youth placed in residential facilities spend more time in foster care overall, are less likely to be placed with their siblings, and are less likely to be placed in or near their home communities. In addition, children placed in residential facilities are at risk of experiencing maltreatment in care. Finally, children placed in these residential facilities are less likely to achieve permanency—a safe and legally permanent family—and therefore are more likely to "age out" of the foster care system without community-based supports to facilitate their successful transition to adulthood. Youth who age out of foster care experience negative outcomes including lower educational achievement, early parenthood, homelessness, unemployment, and incarceration.

177.    Placement in PRTFs also prevents already traumatized children with disabilities in foster care from forming meaningful relationships with "buffering" adults—trusted adults who serve to buffer and soothe a child's physiological stress responses. This lack of trusted adult supports can lead to toxic stress. Toxic stress, in turn, is associated with physical effects on children's neural structures, compromised brain development, and increased risk for stress-related disease and cognitive impairment well into adult years. The availability of positive and stable supports is one of the most

important factors in promoting resilience in traumatized children, but residential settings impede the formation of these secure adult attachments.

178. DHHS-licensed PRTFs in North Carolina are "treatment" facilities in name and definition. But in reality, they are typically highly restrictive, locked settings that are routinely dangerous, distressing, and harmful. Their dire conditions often traumatize children rather than treat them.

179. USA Today, the Fayetteville Observer, and the Charlotte Observer have all recently reported on the abusive conditions North Carolina children experience in PRTFs.

180. As the lead investigator for the North Carolina "Locked Away" investigation publicly explained:

> What we see over and over in state records and in interviews with kids is that kids will get choked, kids will have bones broken, kids will be bruised. They will have elbows and shoulders sprained as workers try to bring them under control and there are definitely some cases that are just gross, including, the report that a 15-year-old boy was repeatedly punched in the face by a worker and ended up with a broken eye socket and was not taken to the hospital for four days.

181. Details about the conditions children experience in PRTFs are known to DHHS through the work of its DHSR division, which oversees the services provided in PRTFs on behalf of DHHS and publishes public reports of its investigations on its website through documents known as Statements of Deficiency. Recent examples, within the last four years, of the harm and abuse children experience at taxpayer-funded PRTFs include: improper physical restraints; inappropriate chemical restraints; inappropriate use of psychotropic medication; inhumane living conditions; and sexual, emotional, and psychological abuse, including racial and homophobic slurs.

43

182. Upon information and belief, inappropriate and harmful physical restraints are used often by staff in PRTFs, thereby severely limiting the physical liberty of children with disabilities in child welfare custody and routinely injuring them. Inappropriate physical restraints can be dangerous, even deadly. After someone died from the use of a "prone" facedown restraint at a DHHS-operated facility in 2012, then-DHHS Secretary Albert Delia ordered that North Carolina providers cease use of prone restraints. These restraints are the same type of restraint that killed 16-year-old Cornelius Frederick in 2020 while confined to a Michigan foster care facility and the same type of restraint that killed George Floyd. This restraint is also known to be disproportionately used on people of color and people with disabilities.

183. Chemical restraints have been inappropriately administered in PRTFs to manage a child's behavior and/or sedate them. Chemical restraints are restraints administered through chemical means, such as injections of sedatives or psychotropic medications. Just like a physical restraint, a chemical restraint severely limits the physical liberty of children with disabilities in child welfare custody and has the potential to cause PTSD, flashbacks, nightmares, and intrusive thoughts. Chemical restraints should be used as a last resort and with proper oversight from medical professionals – not for punishment, discipline, or staff convenience.

184. DHHS admits that it does not conduct "any monitoring or auditing" of PRTFs' adherence to the state's psychotropic medication policies.

185. Additionally, PRTFs housing youth with disabilities in child welfare custody rely on cocktails of powerful psychotropic medications to control children's

44

behavior, again severely limiting the physical liberty of children in child welfare custody and frequently harming them. Psychotropic medications are powerful drugs used to alter a person's mood, cognition, and/or behaviors. There are serious, sometimes irreversible, adverse effects associated with the improper administration of psychotropic drugs, including: obesity, diabetes, suicidal ideation, uncontrollable movements such as tics or tremors, seizures, irreversible movement disorders (such as tardive dyskinesia), and thyroid and pancreas damage.

186. Children with disabilities in foster care are particularly vulnerable to these serious harms associated with psychotropic medications. The U.S. Department of Health and Human Services' Office of Inspector General ("OIG") explained that, "[u]nlike children from intact families, children in foster care often do not have a consistent interested party to coordinate treatment planning or to provide continuous oversight of their mental health treatment. Further, responsibility for children in foster care is shared among multiple people—foster parents, birth parents, and caseworkers—which creates risk of miscommunication, conflict, and lack of follow-up. Children in foster care may also experience multiple changes in placement and in physicians, which can cause health information about these children to be incomplete and spread across many sources. Therefore, children in foster care may be at risk for inappropriate prescribing practices (e.g., too many medications, incorrect dosage, incorrect duration, incorrect indications for use, or inappropriate treatment)."

187. Hence, the 2015 American Academy of Child and Adolescent Psychiatry ("AACAP") recommendations, as well as guidance from the federal Administration for

45

Children and Families ("ACF") and professional organizations, call for collaboration between child welfare agencies, Medicaid agencies, and mental health agencies to effectively monitor the safe administration of psychotropic medication to children with disabilities in foster care. In particular, AACAP calls for the systemic capacity to identify "red flag criteria triggering external reviews" and for "[m]andatory consultations with an identified child and adolescent reviewer" in response to such red flags. ACF guidance similarly calls for systems designed to flag outlier prescriptions, including "instances where children are prescribed too many psychotropic medications, too much medication, or at too young an age: too many, and too much, too young."

188. Without this necessary oversight by DHHS, PRTFs commonly subject children with disabilities in foster care to inappropriate, outlier prescribing practices, such as polypharmacy – the concurrent prescription of multiple psychotropic medications to children. Each of the Named Plaintiffs is currently subject to polypharmacy within PRTFs.

189. Additionally, the following illustrations of conditions within various DHHS-licensed PRTFs within the last four years underscore the dire situations to which DHHS regularly – and knowingly – exposes children with disabilities in foster care, rather than placing them in community-based settings.

190. At Jackson Springs Treatment Center in West End, some of the children did not have functioning, hygienic bathroom facilities, and all of the facilities were generally run-down and in need of repairs. Sinks did not have handles on faucets and/or were not in working order, showers and bathtubs did not have shower curtains or other options for

46

privacy, the bathrooms smelled strongly of mold and mold was visible throughout. The PRTF advertises its "safe, coercive free residential environment." But according to DHSR reports staff restrained children by holding them with their faces "on the wall"; hurt them by pulling their arms too far back and continuing to do so after children said they were in pain; and, on one occasion, restrained a child with a cast on his arm. One child suffered an orbital bone fracture and black eye at the hands of PRTF staff (the child reported being punched in the face by staff while the staff member claimed the child fell after he failed to properly restrain the child). After the injury, the PRTF did not send the child to the hospital or coordinate medical treatment or, upon information and belief, train the staff on proper restraint procedures. Facility staff contacted law enforcement at least 42 times over the course of the year, often without taking any steps to address the child's behavior before involving law enforcement. As of the filing of this complaint, DHHS continues to send children in foster care to Jackson Springs Treatment Center.

191.    At Canyon Hills Treatment Facility in Raeford, whose slogan is "giving children back their childhood," an eight-year-old child reported that staff "beat on the boys." A nurse confirmed that staff "slap them up and slap them around – on the butt and bottom," and another nurse reported witnessing staff choke a child. A nine-year-old with bruises and abrasions across his body reported that a staff member had grabbed him by the shoulder, rubbed spit across his face, and kicked him in the groin. Parents reported that their child was bruised so badly he "looked like he had been through a war zone." At one point, at least one-third of the children lost weight during their stay, and the children began circulating a unanimously signed petition for larger portions and better food. In

47

response, the PRTF *reduced* the children's food portions as punishment. One child reported that a nurse said the PRTF intentionally gave them "a little bit of food" because "your stomach will shrink and then you will not be hungry." A child reported that they were sexually molested while at the PRTF. And staff mocked and harassed children with homophobic terms, calling at least one child a "f-g-ot." According to a news article by the Charlotte Observer, Canyon Hills employees were "resistant and uncooperative" with police and child protective services' attempts to speak with children and staff at the facility and refused to allow them to speak with the child who reported the sexual abuse. As of the filing of this complaint, DHHS continues to send children in foster care to Canyon Hills Treatment Facility.

192.    At Carolina Dunes Behavioral Health in Leland (formerly Strategic Behavioral Center), whose mission is to "Improve the Lives We Touch," a 12-year-old boy less than five feet tall and weighing 94 pounds had his wrist fractured by a 6'6" tall, 200-pound staff member pressing a door against him. Staff did not report the child's injury, and a nurse did not examine his wrist when the child first reported it; it was four days before the child was taken to the hospital to stabilize the fracture. Another staff member injured a 13-year-old child so badly that they had to go to the emergency room. And after a staff was observed kissing a 14-year-old child at the PRTF, the staff admitted to inappropriate sexual contact with the child and to not reporting the incident. The child, who was known to self-harm, told DHHS investigators she was in a romantic relationship with the staff member and that she had been sabotaging her treatment to spend more time with the staff. The girl's therapist described the staff member as a "predator who was

48

grooming a 14-year-old." Additionally, children's bathrooms were found to be damaged and dirty, and some were nonfunctional. There have been numerous medication errors: staff failed to administer medications as ordered by the physician; medication was administered despite there being no order for it; powerful medications were not administered because the facility ran out of it; and documentation failures further complicated determinations as to whether medications were actually administered and in what doses. For example, staff administered the antipsychotic Seroquel numerous times on a single day to a 17-year-old child and later, on a different day, ordered multiple dosages of Seroquel without any documentation of these administrations. Staff also have failed to properly document the use of medications used as chemical restraints, such as the antipsychotic Thorazine. A child reported that the staff kept "giving me needle injections," a chemical restraint, while also being secluded. Staff are also known to use multiple chemical restraints or use them after physical restraints already have been attempted. As of the filing of this complaint, DHHS continues to send children in foster care to Carolina Dunes Behavioral Health.

193. At Hope Gardens Treatment Center in Raeford, where the "team focuses on providing high-quality compassionate behavioral healthcare by utilizing evidenced-based practices, and rendering exclusive therapeutic residential treatment methods in a safe, caring environment," a staff member reported seeing another staff slap a child across the face and place his hands around the child's neck. A police report from the incident stated the child "exhibited difficulty to speak" and was overheard screaming "stop choking me." A few days later, the same staff member called another child the n-word and "a f-g-ot"

49

and told the child "[t]he only reason you are here is because your parents don't love you." Staff members have reportedly called the children in their care "dogs" and referred to their rooms as "dog kennels." In one incident, a staff member "came to work in a bad mood" and told everybody "not to provoke him"; after one of the residents irritated the staff member, the staff member was seen going into the child's room, after which others heard loud banging noises, the child screaming in pain, yelling and cursing back and forth, the child warning the staff member they would bite, and the staff member screaming. Other staff members ran into the room to physically pull the staff member off the resident and pled with the staff member to remember that the resident was "only a little kid." As of the filing of this complaint, DHHS continues to send children in foster care to Hope Gardens Treatment Center.

194. NOVA Behavioral Healthcare in Kinston, which advertises that its "compliment of Residential Managers and Residential Supervisors provide basic and clinical oversight and ensure a safe and homelike living environment," previously was cited for failing to ensure that at least two direct-care staff were present for every six children, in violation of state staffing regulations designed to protect youth. In 2021, a female client at Nova's Maplewood unit tied an electrical cord around her neck, yet the facility determined this incident did not result in a threat to her health or safety and did not report it as required. Similarly, a 17-year-old girl in the Oakwood unit with a documented history of self-harm, suicidal ideation, and suicide attempts "was found sitting on the floor of the bathroom with shoestrings tied around her neck and to the crossbar of the stall doors." There were neither goals nor strategies in the child's

treatment plan to address her suicidal behaviors and ideation, nor sufficient supervision to prevent her from harming herself. Finally, when a child in the Oakwood unit threw milk, a staff member threw it back at her and gave the child's food to other children as punishment. The child became upset, and the staff member reacted by restraining the child. The staff pulled the child's head down by her braids and shoved her face into a pillow, even though this type of life-threatening prone restraint was forbidden by DHHS over ten years ago. The staff member then initiated a restraint known as "the wrap," but restrained the child by the knees – rather than by the ankles as required by policy – and hurt the child by digging her fingernails into the child's skin. The staff member was told to "leave the situation alone" and "to tap out" but refused to disengage. As of the filing of this complaint, DHHS continues to send children in foster care to NOVA Behavioral Healthcare.

195.    At Anderson Health Services in Marshville, staff implemented a psychologically-abusive punishment resembling solitary confinement called "Loss of Privileges" (LOP). A child on LOP was confined to their bedroom for as long as 30 days, with only 15-to-30-minute walks outside. There were no policies or procedures for the use of LOP, and staff were implementing the punishment with virtually no clinical oversight. A volunteer with little-to-no clinical qualifications was "second in charge of the facility and responsible for multiple administrative positions including but not limited to corporate compliance, intake documentation and supervision." A nurse practitioner and two registered nurses responsible for all medications at the facility failed to ensure discontinued medications were stored or properly disposed of. A nurse admitted to failing

51

to lock the door to the medication room "because it was a pain in the 'a*s'" to do so. As a result, 29 pills of Vyvanse (an amphetamine) went missing, and the facility could not determine if staff or children had removed the Vyvanse from the medication room. In another instance, a registered nurse administered Zoloft (a selective serotonin reuptake inhibitor used to treat mental health disorders) and Metformin (an anti-diabetic medication) to the wrong client, who then had to be monitored for hypoglycemic episodes. A child reported that a therapist at the facility sexually touched him during a private therapy session; the therapist was suspended, but it is not clear whether any further action was taken. DHHS suspended Anderson's license on June 1, 2018, but permitted the facility to reopen in 2021 under new management. As of the filing of this complaint, DHHS continues to send children in foster care to Anderson Health Services.

196.    The PRTFs used by DHHS to house children with disabilities in foster care are not therapeutic environments. All children in foster care suffer the trauma of being removed from their family homes, in addition to any trauma relating to the circumstances of their removal. Unsurprisingly, children in foster care frequently have complex trauma histories, including traumas experienced after removal while in foster care. Children in foster care are likely to experience more trauma, not less at a PRTF, yet DHHS continues to place children with disabilities in these facilities.

197.    In commenting on the inappropriate overuse of traumatizing psychiatric facilities for children in North Carolina, a state representative recently explained that "we are ruining people's lives, and we're doing it in the most expensive way possible. . . . It's inhumane and irresponsible. It is a government failure."

52

**B. Black and Brown Children Bear the Brunt of DHHS's Service System Design, Funding Choices, and Service Implementation Failures That Promote or Rely on the Unnecessary Segregation of Children with Disabilities in Foster Care in PRTFs**

198.    Children of color, such as Named Plaintiffs Flora P. and Steph C., are disproportionately affected by the harms associated with DHHS's overreliance on PRTFs.

199.    Black and Brown children are disproportionately represented in the numbers of children in foster care in North Carolina, and are again disproportionately represented in the numbers of children in foster care placed in a PRTF by DHHS.

200.    The disproportionality rate of children in foster care refers to the number of youth in care compared to the number of youth in the general population. Based on 2019 data from Child Trends, the disproportionality rate in North Carolina for Black/African American children in foster care in 2019 was 1.34, and the rate for multiracial children was 1.5.

201.    In Mecklenburg County, one of the largest counties in North Carolina, children of color and Hispanic/Latinx children make up 63% of the population but account for 88% of abuse or neglect reports made to Youth and Family Services (YFS). Mecklenburg County YFS has admittedly "not relieved or exacerbated this disparity, which highlights the powerful downstream effects that disparate initial child welfare contact" can have. This "downstream effect" includes Black and Brown children in foster care bearing an undue and disparate harm from their unnecessary placement in PRTFs.

Case 1:22-cv-01046-WO-LPA   Document 1   Filed 12/06/22   Page 53 of 73

202.    Public news articles in late 2021 reported that while Black children in North Carolina make up about 13% of children (not specific to the foster care population), they make up about 30% of Medicaid recipients within PRTFs.

203.    One article noted that PRTFs may be inappropriately used as a placement for Black children with milder, misunderstood, or misinterpreted symptoms.

204.    The disproportionate use of foster care and unnecessary PRTFs by DHHS imposes unjust and grave harm on Black children with disabilities in foster care.

**C. DHHS's Known Methods of Funding and Administering Its Programs Result in Unlawful and Unnecessary Segregation of Children with Disabilities in Foster Care in PRTFs**

205.    Defendant has a pattern, custom, policy, and/or practice of funding and administering its programs in a manner and through methods that result in the unnecessary segregation of children with disabilities in foster care by failing to plan for, develop, operate, and fund a sufficient array of community-based placements and supportive mental and behavioral health services for children with disabilities in foster care and their caregivers that would allow them to live in integrated settings.

206.    These criteria or methods of administration include: grossly disparate funding of PRTFs rather than community-based placements and supportive mental and behavioral health services; failing to expand community-based foster care placements, including kinship and "fictive" kinship placements and therapeutic foster care; and failing to expand access to and maintaining waitlists and/or shortages of community-based intensive in-home services, community-based wrap-around services, community-based

54

crisis intervention services, and community-based outpatient mental and behavioral health services.

207.     The purpose and philosophy behind North Carolina's child welfare services is to provide family-centered services and serve children in their homes and communities.

208.     Yet DHHS has a policy, pattern, custom, and/or practice of unnecessarily placing children in foster care with disabilities at PRTFs, which by definition provide non-acute and time-limited care, and forcing those children to remain in these facilities long-term when they can and should be served in the community.

209.     This policy, pattern, custom, and/or practice persists because DHHS has failed to make adequate community-based placements and services available.

210.     According to 2020 state data, less than 1% of North Carolina children are in foster care, but foster youth account for almost half of the children residing in PRTFs, placed there by DHHS.

211.     DHHS's "Division of Social Services (DSS) staff shared that children involved with the Child Welfare system sometimes remain in a PRTF long after a discharge plan is made because there is no identified placement available for them."

212.     Children in child welfare custody are admitted to PRTFs despite being appropriate for lower levels of care, remain in the facility longer than children who are not in child welfare custody, often are laterally "discharged" to another PRTF, and experience more frequent readmissions to PRTFs.

213.     DHHS also maintains a pattern, policy, custom, and/or practice of authorizing significant numbers of children to be sent to out-of-state PRTFs, which

55

isolates children who could be served and accommodated in their communities even further from their home communities, families, and peers.

214. Not only do DHHS's practices violate the rights of children to live and be served in the community, they also waste taxpayer's money. DHHS spends at least hundreds of dollars per day per child in a PRTF, and it pays more than $100 million annually to institutionalize children in PRTFs.

215. DHHS could, but has failed to, expand community-based placements and supportive mental and behavioral health services for children with disabilities in child welfare custody.

216. DHHS admits that North Carolina has a "limited array of available community-based services across the state to support children remaining in family settings or the least restrictive setting possible." It acknowledges that this shortage is causing its recent "[c]hallenges meeting the needs of children/youth in foster care with complex . . . behavioral health . . . or [intellectual/developmental disability] needs, resulting in restrictive residential or out-of-state placements."

217. Although the rate of children in foster care has increased from around 10,000 youth in 2017 to over 11,000 youth in 2021, DHHS has not expanded the number of community-based placements available for these youth. Instead, the number of families and children receiving in-home services has steadily declined. Moreover, the number of licensed foster families is dwindling, dropping from 7,100 to 6,500 as of June 2022. For example, in Cumberland County, licensed foster homes decreased from 111 in

2018 to only 54 in 2021. The lack of foster family homes is a significant driver of children's being unnecessarily placed in PRTFs.

218. DHHS needs to expand community-based foster care placements, including kinship and "fictive" kinship placements. According to DHHS's federal reporting, "data on the use of congregate care suggest North Carolina lacks an adequate supply of family foster homes in at least some counties and regions." A recent survey found that the most common reason for placement in congregate care "was the lack of an available family foster home."

219. It was reported that from 2019 to 2020, less than a third of children discharged from a PRTF transitioned to a community-based program, and some were laterally discharged to another PRTF.

220. As DHHS describes it, its child welfare services are an insufficient and disparate patchwork of services for the traumatized children that DHHS must protect and provide treatment for.

221. According to one DHHS official in September 2022, North Carolina's child welfare system "is in crisis." The same DHHS official publicly admitted that the state could be sued at any time because of its systemic lack of appropriate placements for children in foster care.

222. On any given day, the state averages about 50 children with emotional and behavioral health needs "who have been discharged [from emergency rooms], but their appropriate level of placement has not been located." According to recent state data, due to the lack of appropriate placements and services, at least "dozens" of children in foster

care end up "sleeping in hospital emergency rooms, in county departments of social services offices or local hotel rooms" each week. Moreover, the lack of community-based services puts children with disabilities in foster care at risk for placement in PRTFs.

**D. Community-Based Services and Placements Should Be Used When Appropriate for Children with Disabilities in Foster Care, but DHHS Fails to Prioritize Integrated Services**

223.    Living in inappropriate settings further traumatizes children in foster care. According to DHHS's own 2022 report, "[t]he longer children are separated from their families, the less likely they are to be reunified with them, and they run a higher risk of experiencing poor health and social outcomes, including homelessness and involvement with the justice system.

224.    The current institutional reality of day-to-day child welfare practices stands in stark contrast to DHHS's policy that "[i]nstitutional placement should be a rare exception and there must be clear and convincing habilitative, physical, and/or clinical reasons to support the placement."

225.    The lack of community-based mental and behavioral health services, coupled with frequent placement disruptions resulting from a lack of these services, places children with disabilities in foster care at serious risk for placement, and/or extended stays, in PRTFs, and for lengthy and repeat stays in PRTFs.

226.    The federal government published a report showing that children placed in, or at serious risk for placement in, PRTFs can be served more effectively and at a much lower cost in the community.

58

227.    DHHS knows that evidence-based wraparound services in the community are effective and help children such as Timothy B., Flora P., Isabella A., and Steph C. DHHS states that "[t]his intensive program has been shown to keep more children in their homes, preventing the need for facility-based or residential care." It also would save the state an estimated $33,000 per child served via high-fidelity wraparound services instead of via a PRTF placement.

228.    National data also support the provision of evidenced-based wraparound and other community-based services, showing that children do not have better outcomes in PRTFs and "do not appear to gain greater benefit from [congregate] treatment relative to peers with similar risk profiles but treated in family settings."

229.    According to state data, while North Carolina Medicaid offers high-fidelity wraparound services – an evidence-based care management program for children with mental health challenges that has been shown to keep children in their homes and prevent the need for facility-based or residential care – these services are offered in only 33 out of the 100 counties in North Carolina, and DHHS admits more funding is needed to expand these services across the entire state.

230.    According to a 2021 DHHS study, one roadblock to community-based services for children with disabilities in foster care is a shortage of sufficient qualified service providers. "Too many community-based service providers do not have the skills necessary or incentives to serve individuals with complex needs or challenging behaviors, leaving state-operated facilities and costly, out-of-state psychiatric residential treatment facilities (PRTFs) as the only options for services for these individuals."

231.    It would not effect a fundamental alteration to North Carolina's child welfare system if DHHS and its agents were ordered to make arrangements to expand community-based services and placements for children with mental impairments in child welfare custody.

232.    DHHS recently stated in 2022 that it "can build upon existing effective and innovative supports scattered across our state with targeted, ongoing investments to provide coordinated, consistent services that deliver better outcomes for children, families, and the state."

233.    In the same report, DHHS described its child welfare and behavioral health services as a patchwork of uneven support across the state. DHHS admits that children with complex behavioral health needs in the care of child welfare services require DHHS's "immediate attention through better coordination and increased resources for services that close gaps in care."

234.    DHHS has also acknowledged its problem with waitlists for services. Defendant Kinsley recently noted that a "core factor that drives a lot of these waitlists . . . is our vacancy rate" for employees. The Department's employee vacancy rate has doubled since the COVID-19 pandemic, reaching over 23% as of July 2022. That includes a 42% rate, or 46 vacancies, for psychologists, and a 44% rate, or 68 vacancies, for clinical social workers. According to Defendant Kinsley, the "situation means increased waitlists, increased time on waitlists, increased need for services, and fewer people served."

235.    Through its Medicaid program, in which all Named Plaintiffs and putative

class members are enrolled, DHHS facially offers community-based services and

placements to children with disabilities in foster care, but it has not made these services

available to all youth who need them. As a result, children with disabilities in foster care

are forced into PRTFs, in violation of their rights under the ADA and Rehabilitation Act.

236.    For example, according to state data, although North Carolina Medicaid

offers care management services, which consist of a facilitator-led team and supports for

the family and child to help reach agreed-upon goals, less than 50% of children in North

Carolina's foster care system access these services.

237.    Data collected during a focus group to review in-home mental and

behavioral health services as part of DHHS's 2022 reporting to the federal

Administration on Children identified numerous systemic issues barring access to

services. These barriers include a limited number of available services, poor quality

services, poor accessibility of services, need for more flexible services, transportation

barriers, lack of funding for programs, and waitlists.

238.    DHHS's 2022 federal reporting also stated "that there are significant

systemic barriers to families' accessing services. The most commonly cited barriers were

limited services or no available services, transportation to services, and youth having a

dual diagnosis of mental health and substance use issues."

239.    Mobile crisis services provide in-person and virtual support within an hour

of being called when a child is in crisis and connect a child with necessary clinical and

social services. North Carolina recognized and admitted in 2022 that expansion of such

services would keep children out of restrictive residential settings and connect them more rapidly to community-based services. However, according to state data, North Carolina's "MORES" in-person and virtual Crisis Intervention Teams for youth experiencing mental health crises is offered in only a fraction of counties in the state.

240. All of the above methods of DHHS's administration of its programs, individually and collectively, cause in significant part the unnecessary institutionalization and segregation of children with disabilities in foster care in PRTFs.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA"), 42 U.S.C. § 12101 *et seq.*
### (Asserted on behalf of Plaintiffs DRNC and NC NAACP, the Named Plaintiffs, and the putative class against Defendant Kinsley in his official capacity)

241. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

242. Title II of the ADA requires, *inter alia*, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *See* 42 U.S.C. § 12132.

243. DHHS is a "public entity" as used in Title II of the ADA. *See* 42 U.S.C. § 12131(1)(B). Defendant, acting in his official capacity, is a public entity as defined by the ADA, 42 U.S.C. § 12131, and its implementing regulations, 28 C.F.R. § 35.104. As such, the ADA prohibits Defendant from discriminating against individuals with

disabilities in its programs and services. *See* 42 U.S.C. § 12132. Further, Defendant's unnecessary segregation of individuals with disabilities constitutes unlawful discrimination under Title II of the ADA. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

244. The Named Plaintiffs and the putative class are qualified individuals with disabilities entitled to the protections of the ADA, 42 U.S.C. § 12131, and its implementing regulations, 28 C.F.R. § 35.104.

245. Child welfare services, including foster care, the North Carolina Medicaid program, state-funded disability services, and oversight of PRTFs, are services, programs, or activities of Defendant, a public entity.

246. The Named Plaintiffs and the putative class are otherwise qualified individuals with disabilities for purposes of these services, programs, or activities of Defendant.

247. Title II contains an "integration mandate" requiring public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

248. DHHS and its agents institutionalized the Named Plaintiffs and the putative class in PRTFs, or have acted or failed to act in a manner that puts the Named Plaintiffs and the putative class at serious risk for institutionalization in a PRTF, a wholly segregated setting, in violation of the integration mandate.

249. Title II further provides that public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid,

63

benefit, or service that is" either "not equal to that afforded others" or "not as effective in affording equal opportunity" to gain the same result or benefit as provided to others. *See* 28 C.F.R. § 35.130(b)(1)(ii)-(iii).

250. Title II of the ADA requires public entities to make reasonable modifications to their child welfare programs to avoid discrimination on the basis of disability. *See* 28 C.F.R. § 35.130(b)(7).

251. As children in child welfare custody, the Named Plaintiffs and the putative class are categorically eligible for Medicaid and are presumed eligible, based on disability, for DHHS's publicly-funded mental health services, and such community-based services already exist. Defendant has not made reasonable modifications, to the extent any are necessary, to provide the Named Plaintiffs and the putative class access to these community-based child welfare services and integrated placements.

252. Public entities cannot use criteria or methods of administration that discriminate on the basis of disability. *See* 28 C.F.R. § 35.130(b).

253. Defendant has a policy and practice of discriminating against the Named Plaintiffs and the putative class based on disability by relying on criteria or methods of administration in its child welfare services that prioritize or permit placement of the Named Plaintiffs and the putative class in institutions based on their disability and need for services, even though home and community-based placements and services are available and are being provided to other children with the same diagnoses. These criteria or methods of administration include: grossly disparate funding of PRTFs rather than community-based placements and supportive mental and behavioral health services;

64

failing to expand community-based foster care placements, including kinship and "fictive" kinship placements and therapeutic foster care; and failing to expand access to, maintaining waitlists for, and/or permitting shortages of community-based intensive in-home services, community-based wrap-around services, community-based crisis intervention services, and community-based outpatient mental and behavioral health services.

254. Defendant has a policy and practice of planning, administering, and funding its child welfare system in a manner that unnecessarily segregates children with disabilities in PRTFs. As a result, children with disabilities in the custody of child welfare agencies are needlessly segregated or at serious risk of unnecessary segregation.

255. The Named Plaintiffs and the putative class do not oppose community-based treatment and placement.

256. An integrated setting is appropriate for the Named Plaintiffs and the putative class. Other children with the same diagnoses and/or similar needs are receiving services in integrated settings and live in community-based integrated placements.

257. As a result of Defendant's actions and inactions, the Named Plaintiffs and the putative class have suffered and will continue to suffer irreparable harm: they have suffered and will continue to suffer from discrimination, unnecessary institutionalization, and inability to access community-based mental health services and other supports while in the custody of child welfare agents, deprivation of adults with whom they can form healthy attachments, the known harms of exposure to congregate care placement, and injury to their prospects for lifelong success and prosperity.

65

258.    In the absence of declaratory and injunctive relief, Defendant will continue to institutionalize and deny Plaintiffs their right to live in the most integrated setting appropriate to their needs.

**SECOND CAUSE OF ACTION:**
**DISCRIMINATION IN VIOLATION OF SECTION 504 OF THE**
**REHABILITATION ACT, 29 U.S.C. § 794**
**(Asserted on behalf of Plaintiffs DRNC and NC NAACP, the Named Plaintiffs, and the putative class against Defendant Kinsley in his official capacity)**

259.    Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if alleged herein.

260.    Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

261.    The Named Plaintiffs and the putative class are otherwise qualified individuals with disabilities entitled to the protections of the Rehabilitation Act. *See* 29 U.S.C. § 705(20)(B) (citing to the ADA's definition at 42 U.S.C. § 12102).

262.    The Rehabilitation Act defines a "program or activity," in pertinent part, as "all of the operations of a department [or] agency . . . of a State or of a local government." 29 U.S.C. § 794(b)(1).

263.    DHHS is a governmental agency that receives "federal financial assistance" as used in the Rehabilitation Act and operates programs or activities within the meaning

66

of Section 504. *See* 29 U.S.C. § 794(b)(1)(A). Defendant, acting in his official capacity, administers programs or activities as defined by the Rehabilitation Act, 29 U.S.C. § 794(b), and its implementing regulations, 28 C.F.R. § 41.51.

264. Child welfare services, including foster care, the North Carolina Medicaid program, state-funded disability services, and oversight of PRTFs, are programs or activities of Defendant.

265. The Rehabilitation Act contains an "integration mandate" requiring covered entities to provide aids, benefits, and services that afford people with disabilities "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2).

266. DHHS's agents have placed the Named Plaintiffs and the putative class in PRTFs and/or have acted or failed to act in a manner that puts the Named Plaintiffs and the putative class at serious risk for placement in a PRTF, a wholly segregated placement that is not as effective as community-based behavioral and mental health treatment, denies children adequate social-emotional caregiver-child interactions, and is likely to lead to less positive outcomes for the Named Plaintiffs and the putative class than would provision of community-based treatment and placement in a community-based setting.

267. DHHS's agents have institutionalized the Named Plaintiffs and the putative class, and/or placed them at serious risk of institutionalization, in a PRTF, a wholly segregated setting that violates the integration mandate.

268.    The Rehabilitation Act forbids covered entities from using criteria or methods of administration that discriminate on the basis of disability or defeat or substantially impair accomplishment of the objectives of the recipient's program or activity. 45 C.F.R. § 84.4(b)(4).

269.    Defendant discriminates against the Named Plaintiffs and the putative class based on disability by relying on criteria or methods of administration that prioritize or permit institutional placement of the Named Plaintiffs and the putative class in PRTFs, despite their eligibility for an array of home and community-based placements and services. These criteria or methods of administration include: grossly disparate funding of PRTFs relative to community-based placements and mental and behavioral health services; failing to expand community-based foster care placements, including kinship and "fictive" kinship placements and therapeutic foster care; failing to expand access to, and maintaining waitlists and/or shortages of, community-based intensive in-home services, community-based wrap-around services, community-based crisis intervention services, and community-based outpatient mental and behavioral health services.

270.    DHHS plans, administers, and funds its child welfare system in a manner that unnecessarily segregates children with disabilities in PRTFs.

271.    Defendant defeats or substantially impairs its objective of improving, not hindering, outcomes for children with disabilities in its custody by permitting the Named Plaintiffs' and the putative class's continued placement in wholly segregated settings that are less effective and less likely to lead to positive outcomes for the Named Plaintiffs and the putative class.

68

272.    The Named Plaintiffs and the putative class do not oppose community-based treatment.

273.    An integrated setting is appropriate for the Named Plaintiffs and the putative class; other children with similar diagnoses and/or similar needs are receiving services in integrated settings and live in community-based integrated placements.

274.    As a result of Defendant's actions and inactions, the Named Plaintiffs and the putative class have suffered and will continue to suffer irreparable harm: they have suffered and will continue to suffer from discrimination and unequal access to Defendant's child welfare services, deprivation of adults with whom they can form attachments, the known harms of exposure to congregate care placement, and injury to their prospects for lifelong success and prosperity.

275.    In the absence of declarative and injunctive relief, Defendant will continue to unnecessarily institutionalize and deny the Named Plaintiffs and the putative class their right to live in the most integrated settings appropriate to their needs and which provide them equal opportunity to reach the same level of achievement as children with mental impairments who are placed in the community and receive community-based behavioral and mental health treatment.

## PRAYER FOR RELIEF

**THEREFORE,** Plaintiffs respectfully request that the Court exercise its legal and equitable powers and award class-wide relief as follows:

A. Assert subject matter jurisdiction over the action.

B. Certify the putative class pursuant to FED. R. CIV. P. 23(a) and (b)(2).

C. Declare unlawful pursuant to FED. R. CIV. P. 57: policies, procedures, and practices that violate Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, or Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and their implementing regulations such as:

    a. Defendant's failure to place and provide the Named Plaintiffs and the putative class with services in the most integrated settings appropriate to meet their needs;

    b. Defendant's use of criteria and methods of administration in its child welfare services that deny the Named Plaintiffs and the putative class the opportunity to live and receive services in the most integrated settings appropriate to meet their needs; and

    c. Defendant's failure to plan, administer, and fund its mental and behavioral health system and child welfare system in a manner that does not unnecessarily segregate children with mental impairments in PRTFs.

D. Award prospective permanent injunctive relief and order appropriate tailored remedies, including but not limited to requiring Defendant to:

a. Administer its programs such that it has available a sufficient supply of integrated, community-based placements and services to meet the needs of children with mental impairments in foster care;

b. Implement and sustain an effective system for transitioning children with mental impairments in foster care out of PRTFs into integrated, community-based placements and services; and

c. Make reasonable accommodations or modifications, as necessary, to meet the needs of North Carolina's children with mental impairments in foster care in integrated, community-based placements and services.

E. Modify or develop and implement policies and practices as necessary to cease its violations of the statutory rights of children with disabilities in foster care placed or at serious risk of placement in PRTFs.

F. Appoint a neutral expert under FED. R. CIV. P. 65(d) to monitor the provisions of the Court's order.

G. Award to Plaintiffs' counsel the reasonable costs and expenses including reasonable attorneys' fees pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 12205, 29 U.S.C. § 794a, and FED. R. CIV. P. 23(e) and 23(h).

H. Grant such other further and equitable relief as the Court deems just, necessary, and proper to protect Plaintiffs from further harm while in Defendant's custody and care.

DATED: DECEMBER 6, 2022

DISABILITY RIGHTS NORTH CAROLINA

/s/ *Holly Stiles*
Holly Stiles
N.C. State Bar No. 38930
Lisa Nesbitt
N.C. State Bar No. 39942
Emma Kinyanjui
N.C. State Bar No. 31450
Joonu Coste
N.C. State Bar No. 55138
3724 National Drive Suite 100
Raleigh, NC 27612
919-856-2195
919-856-2244 (fax)
holly.stiles@disabilityrightsnc.org
lisa.nesbitt@disabilityrightsnc.org
emma.kinyanjui@disabilityrightsnc.org
joonu.coste@disabilityrightsnc.org


CHILDREN'S RIGHTS

/s/ *Marissa C. Nardi*
Marissa C. Nardi (*by Special Appearance herewith*)
N.Y. State Bar No. 5173265
N.J. State Bar No. 028502012
Ira Lustbader (*by Special Appearance herewith*)
N.Y. State Bar No. 2516946
Stephen Dixon (*by Special Appearance herewith*)
L.A. Bar No. 18185
Lindsey Frye
N.C. State Bar No. 47752
Bianca Herlitz-Ferguson (*Special Appearance forthcoming*)
C.T. State Bar No. 443029
Carolyn Hite (*by Special Appearance herewith*)

72

N.Y. State Bar No. 5677422
88 Pine Street, Suite 800
New York, New York 10005
(212) 683-2210
mnardi@childrensrights.org
ilustbader@childrensrights.org
sdixon@childrensrights.org
lfrye@childrensrights.org
bherlitzferguson@childrensrights.org
chite@childrensrights.org


NORTH CAROLINA STATE CONFERENCE OF THE NAACP

/s/ *Irving Joyner*
Professor Irving Joyner
N.C. State Bar No. 7830
P.O. Box 374
Cary, North Carolina 27512
(919) 318-8353
ijoyner@NCCU.EDU


MOORE & VAN ALLEN, PLLC

/s/ *Joshua Lanning*
Joshua Lanning
N.C. State Bar No. 38858
Kaitlin Price
N.C. State Bar No. 50941
Ben Shook
N.C. State Bar No. 44793
100 North Tryon St., Suite 4700
Charlotte, NC 28202
(704) 331-1000
joshlanning@mvalaw.com
kaitlinprice@mvalaw.com
benshook@mvalaw.com

**ATTORNEYS FOR PLAINTIFFS**

73