IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TIMOTHY B., by and through        )
his Guardian ad Litem             )
Robert War, FLORA P.,             )
by and through her Guardian       )
ad Litem Robert War,              )
ISABELLA A., by and through       )
her Guardian ad Litem             )
Jeffrey C. Holden, STEPH C.,      )
by and through his Guardian       )
ad Litem Jeffrey C. Holden,       )
for themselves and for those      )
similarly situated, LONDON R.,    )
a minor, DISABILITY RIGHTS        )
NORTH CAROLINA, and NORTH         )        1:22-cv-1046
CAROLINA STATE CONFERENCE         )
OF NAACP,                         )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )
                                  )
KODY KINSLEY, Secretary           )
of the North Carolina             )
Department of Health and          )
Human Services ("DHHS")           )
in his official capacity,         )
                                  )
          Defendant.              )


**<u>MEMORANDUM OPINION AND ORDER</u>**

**OSTEEN, JR., District Judge**

     Before this court is a Motion to Dismiss Plaintiffs'

Amended Complaint, filed by Defendant Kody Kinsley, in his

official capacity as Secretary of the North Carolina Department

of Health and Human Services ("DHHS" or "Defendant"). (Doc. 40.)

For the reasons explained below, this court will deny Defendant's Motion to Dismiss.

## I. <u>FACTUAL AND LEGAL BACKGROUND</u>

On a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." <u>Ray v. Roane</u>, 948 F.3d 222, 226 (4th Cir. 2020) (internal quotation marks omitted) (quoting <u>King v. Rubenstein</u>, 825 F.3d 206, 212 (4th Cir. 2016)). The facts, taken in the light most favorable to Plaintiffs, are as follows. Additional facts will be discussed in the analysis as necessary.

Plaintiffs are children with disabilities who are in the custody of North Carolina's child welfare system. (Am. Class Action Compl. for Declaratory and Inj. Relief ("Compl.") (Doc. 35) ¶¶ 1, 5.)[1] Plaintiffs filed an Amended Complaint on March 6, 2023, naming Kody Kinsley in his official capacity as Secretary of the North Carolina Department of Health of Human Services ("DHHS" or "Defendant") as Defendant. (<u>See</u> <u>id.</u> ¶ 141.) Defendant "oversees and operates all aspects of the North Carolina child welfare system." (<u>Id.</u> ¶ 144.)

_____

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 2 -

Plaintiffs allege Defendant discriminates against children with disabilities within the North Carolina child welfare system by unnecessarily segregating them from their home communities and routinely isolating them in institutions knowns as psychiatric residential treatment facilities ("PRTFs"), in violation of Title II of the Americans with Disabilities Act ("Title II"), 42 USC §§ 12131 et seq., and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. §§ 794 et seq. (Id. ¶¶ 1, 12.) "PRTFs are designed to provide intensive, short-term, residential psychiatric treatment for temporary stabilization." (Id. ¶ 4.)

As a public entity, Defendant is required to comply with Title II and Section 504. (Id. ¶ 269.) Both Title II and Section 504 prohibit discrimination on the basis of disability. See 42 U.S.C. § 12132; 29 U.S.C. § 794.[2] In order to implement the anti-discrimination provisions of Title II, the Attorney General has issued two relevant regulations: the integration mandate, 28

---

[2] "Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same." Wicomico Nursing Home v. Padilla, 910 F.3d 739, 750 (4th Cir. 2018) (internal quotation marks omitted) (quoting Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 336 n.1 (4th Cir. 2012)). For ease of reference, this court will discuss both Title II and Section 504 in terms of the ADA's Title II.

C.F.R. § 35.130(d), and the methods of administration regulation, 28 C.F.R. § 35.130(b)(3).

The "integration mandate" requires a public entity to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "methods of administration" regulation prohibits public entities from utilizing "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination." 28 C.F.R. § 35.130(b)(3)(i).

In Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), the Supreme Court, relying on the integration mandate, recognized unjustified institutional isolation of persons with disabilities as a form of discrimination. Id. at 597. "Since Olmstead, public entities and courts . . . have grappled with . . . what is required to satisfy the Integration Mandate." Day v. District of Columbia, 894 F. Supp. 2d 1, 7 (D.D.C. 2012); see Darian B. Taylor, Annotation, Unjustified Institutionalization of Individuals with Disabilities as Violation of Federal Antidiscrimination Provisions — Post-Olmstead Cases, 90 A.L.R. Fed. 2d 1 § 2 (2014) ("As a result of the Olmstead decision, disabled persons both in and out of state institutions have engaged in what has become known as 'Olmstead

- 4 -

litigation' — suits filed often as class actions alleging that a state entity has discriminated against those individuals under the ADA and RA by failing to provide community-based treatment services that would either allow them to be released from institutionalization or that jeopardize their ability to remain in their home or community and outside the confines of an institution.").

Plaintiffs' discrimination claims are based on two separate but related theories: (1) a failure by Defendant to provide child welfare services in the most integrated setting appropriate, in violation of the integration mandate and Olmstead; and (2) employing criteria or methods of administration that prioritize or permit unjustified institutionalization of Plaintiffs, in violation of the "methods of administration" regulation. (Compl. (Doc. 35) ¶¶ 273, 274, 277–80.)

Plaintiffs allege "Defendant has a pervasive, system-wide practice of unnecessarily segregating children in its care in PRTF institutions instead of providing care and placement for them in their communities." (Id. ¶ 187.) While Defendant "ostensibly offers community-based placements and services," the availability of such services is too limited — fueling an overreliance on placement in PRTFs. (Id. ¶ 14.) Children with

- 5 -

disabilities in North Carolina's child welfare system face
significant barriers to accessing community-based placements and
services, including "shortages or waitlists for intensive in-
home services, crisis intervention services, outpatient mental
health and substance abuse services, and inadequate
transportation to and from such services." (Id.) However,
instead of addressing these barriers and expanding community-
based placements and services, Defendant sends children to PRTFs
"because it has nowhere else to put them." (Id.)

Defendant is "a principal department of the North Carolina
Executive Branch with wide-ranging functions, powers, duties,
and obligations." (Id. ¶ 144.) The Complaint outlines the
various divisions within Defendant's department, as they relate
to the child welfare care system in North Carolina:

> The DSS (Division of Social Services) within DHHS
> supervises and provides technical assistance to county
> DSS offices, which make placement decisions for youth in
> foster care, including PRTF placement. The Division of
> Health Services Regulation ("DHSR") within DHHS monitors
> and oversees all licensed mental health facilities in
> North Carolina, including PRTFs. DHHS administers North
> Carolina's statewide Medicaid program ("NC Medicaid")
> through its Division of Health Benefits. DHHS also
> oversees mental health and developmental disability
> services, including treatment at PRTFs, through its
> Division of Mental Health, Developmental Disabilities,
> and Substance Abuse Services ("DMH/DD/SAS"). This
> division is also responsible for ensuring that
> high-quality mental health and developmental disability
> services are available to people that need them. The
> DMH/DD/SAS division contains the statutorily-created
> Commission for Mental Health, Developmental Disabilities

and Substance Abuse Services, which has the authority to
adopt and repeal rules pertaining to all mental health
programs, including operating standards for licensed
mental health facilities such as PRTFs.

(Id.) Defendant is "statutorily responsible for supervising the
regional- and county-level administration of North Carolina's
child welfare system." (Id. ¶ 150.)

Defendant also administers North Carolina's statewide
Medicaid program through its Division of Health Benefits. (Id.
¶ 144.) Plaintiffs allege children within the putative class are
eligible for community-based services provided through the
statewide Medicaid program but are unable to receive these
services in an integrated setting. (Id. ¶ 277.) As a result,
Plaintiffs are forced into institutions to receive care, which
is isolating and often inadequate. (Id. ¶ 14.)

From fiscal year 2020 to 2021, Defendant placed at least
572 children in PRTFs, including Named Plaintiffs, referred to
by the pseudonyms Timothy B., Flora P., Isabella A., Steph C.,
and London R. (Id. ¶ 5.) Named Plaintiffs bring this action on

behalf of themselves, through their Guardians Ad Litem,[3] and a putative class of similarly situated children. (Id. ¶ 154.)

Two advocacy organizations, Disability Rights North Carolina ("DRNC") and the North Carolina State Conference of NAACP ("NC NAACP") (together, "Associational Plaintiffs"), join Named Plaintiffs in this action as associational plaintiffs. (Id. ¶¶ 25, 32.) DRNC is an independent nonprofit organization organized under the laws of the State of North Carolina. (Id. ¶ 25.) DRNC is designated as the statutorily authorized Protection and Advocacy system for the State of North Carolina, charged with protecting and advocating for the rights of individuals with disabilities. (Id. ¶ 27.) Named Plaintiffs and members of the putative class are constituents of DRNC. (Id. ¶ 28.) The NC NAACP is a membership-based nonprofit civil rights organization whose mission is to "ensure the rights of all persons to equality and to eliminate racial discrimination." (Id. ¶ 32.) African Americans and children of color within the putative class, such as Flora P., Steph C., and London R., are constituents of NC NAACP. (Id. ¶ 36, 38.) Plaintiffs allege

_____

[3] Robert Ward represents Named Plaintiffs Timothy B. and Flora P. (Id. ¶¶ 129-32.) Jeffrey C. Holden represents Named Plaintiffs Isabella A. and Steph C. (Id. ¶¶ 133-36.) Meghann Gunderman Sehorn represents London R. (Id. ¶ 137-38.) All three Guardians Ad Litem have met with the Named Plaintiffs they seek to represent and are "dedicated to serving [their] best interests in this litigation." (Id. ¶¶ 132, 136, 160.)

children of color are disproportionately affected by the harms associated with DHHS's overreliance on PRTFs. (Id. ¶ 224.)

Plaintiffs allege Defendant violates the integration mandate by failing to provide children with disabilities in the child welfare system with community-based services — forcing children into institutions to receive needed care when institutionalization would not otherwise be necessary. (Id. ¶ 261.) Children with disabilities face a long waitlist for these services, which is driven by the high employee vacancy rate at DHHS. (Id. ¶ 260.) Additionally, Defendant fails to maintain an adequate number of community-based placements and licensed foster families. (Id. ¶ 243.)

Moreover, the treatment and services Named Plaintiffs receive in PRTFs are, at best, inadequate, and, at worst, highly abusive. (See id. ¶ 5.) Named Plaintiffs "regularly face trauma within PRTFs." (Id.) They are "confined to prison-like settings under the care of a poorly trained and understaffed workforce;" subject to physical, emotional, and sexual abuse; "face mental health deterioration;" and are placed on "heavy cocktails of mind-altering psychotropic medications." (Id.) Furthermore, more than a third of children in PRTFs are sent to out of state institutions that are "too far for their caseworkers to keep an eye on their safety or for their families to visit them." (Id.

- 9 -

¶ 8.) Children of color are disproportionately represented in the foster care system, and, within the system, "Black and Brown children with disabilities are disproportionately confined to PRTFs." (Id. ¶ 6.)

If Defendant made more community-based programs and services available, it would allow children with disabilities to live in the community and receive care in the most integrated setting appropriate. (See id. ¶ 3.) Plaintiffs allege that Defendant has the resources and ability to provide expanded community-based options, but instead spends a disproportionate amount of resources on institutional care settings. (Id. ¶ 16.) Plaintiffs allege that "community-based placements are more effective, yield better outcomes for children, and are less costly." (Id. ¶ 15.)

Relatedly, Plaintiffs allege "Defendant has a policy and practice of discriminating against the Named Plaintiffs and the putative class based on disability by relying on criteria or methods of administration" which result in unnecessary institutionalization. (Id. ¶ 279.) Those criteria or methods of administration include:

> grossly disparate funding of PRTFs rather than community-based placements and supportive mental and behavioral health services; failing to expand community-based foster care placements, including kinship and "fictive" kinship placements and therapeutic foster care; and failing to expand access to,

- 10 -

maintaining waitlists for, and/or permitting shortages of community-based intensive in home services, community-based wrap-around services, community-based crisis intervention services, and community-based outpatient mental and behavioral health services.

(Id.)

Plaintiffs seek declaratory and injunctive relief. Plaintiffs request this court award prospective permanent injunctive relief, including but not limited to, requiring Defendant to:

a. Administer its programs such that it has available a sufficient supply of integrated, community-based placements and services to meet the needs of children with mental impairments in foster care;
b. Implement and sustain an effective system for transitioning children with mental impairments in foster care out of PRTFs into integrated, community-based placements and services; and
c. Make reasonable accommodations or modifications, as necessary, to meet the needs of North Carolina's children with mental impairments in foster care in integrated, community-based placements and services.

(Id. at 76–77.) Plaintiffs also request an injunction requiring Defendant to "[m]odify or develop and implement policies and practices as necessary to cease its violations of the statutory rights of children with disabilities in foster care placed or at serious risk of placement in PRTFs." (Id. at 77.)

The Complaint contains two causes of action asserted on behalf of Named Plaintiffs, the putative class, and Associational Plaintiffs: (1) discrimination in violation of Title II of the ADA; and (2) discrimination in violation of

- 11 -

Section 504 of the Rehabilitation Act. (Id. ¶¶ 267–301.)
Defendant's motion to dismiss argues: (1) Plaintiffs do not have
standing; (2) Plaintiffs fail to state an Olmstead claim; and
(3) Plaintiffs' claims are barred by issue preclusion. (Mem. in
Supp. of Def.'s Mot. to Dismiss ("Def.'s Br.") (Doc. 41) at 8–
9.) For the following reasons, Defendant's motion to dismiss
will be denied.

## II. **PROCEDURAL HISTORY**

On March 6, 2023, Plaintiffs filed their Amended Class
Action Complaint for Declaratory and Injunctive Relief. (Compl.
(Doc. 35).) On March 20, 2023, Defendant filed a Motion to
Dismiss Plaintiffs' Amended Complaint for failure to state a
claim, or, alternatively, for lack of standing, (Mot. to Dismiss
Pls.' Am. Compl. ("Def.'s Mot.") (Doc. 40)), and a memorandum in
support, (Def.'s Br. (Doc. 41)). Plaintiffs filed a response in
opposition, (Pls.' Opp. to Def.'s Mot. to Dismiss ("Pls.'
Resp.") (Doc. 53)), and Defendant replied, (Reply in Supp. of
Def.'s Mot. to Dismiss ("Def.'s Reply") (Doc. 58)). On April 21,
2023, the United States filed a Statement of Interest pursuant
to 28 U.S.C. § 517 to provide its views regarding the legal
standard for stating a claim under Title II and Section 504.
(Statement of Interest of the United States of America
("Statement of Interest") (Doc. 57).)

## III. <u>**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**</u>

Defendant moves to dismiss Plaintiffs' Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of standing. (See Def.'s Mot. (Doc. 40) at 1.)

### A. <u>**Standard of Review**</u>

A defendant may challenge subject-matter jurisdiction facially or factually. See <u>Kerns v. United States</u>, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, a defendant asserts that the allegations, taken as true, are insufficient to establish subject-matter jurisdiction. <u>Id.</u> The court then effectively affords a plaintiff "the same procedural protection as he would receive under a Rule 12(b)(6) consideration," taking the alleged facts as true and denying the Rule 12(b)(1) motion if the complaint "alleges sufficient facts to invoke subject matter jurisdiction." <u>Id.</u> The party seeking to invoke the federal court's jurisdiction has the burden of establishing standing. <u>Miller v. Brown</u>, 462 F.3d 312, 316 (4th Cir. 2006). Here, Defendant asserts a facial challenge to Plaintiffs' standing. (See Def.'s Br. (Doc. 41) at 24-25.)

### B. <u>**Analysis**</u>

Defendant argues Plaintiffs lack standing because they cannot show "that the individual Named Plaintiffs' alleged injuries were caused by DHHS or are likely to be redressed by

- 13 -

the relief the Plaintiffs seek." (Id. at 25.) Defendant further argues that the Associational Plaintiffs lack standing because the organizations cannot assert representative standing. (Id. at 28.)

To establish standing, a plaintiff must demonstrate three elements: (1) that the plaintiff has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury is fairly traceable to the challenged conduct of the defendant; and (3) that a favorable decision is likely to redress the injury. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). "At least one plaintiff must demonstrate standing for each claim and form of requested relief." Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018.) Plaintiffs seek declaratory and injunctive relief. (Compl. (Doc. 35) at 76–77.)

### 1.  Individually Named Plaintiffs

Named plaintiffs who purport to represent a class must allege that they personally have standing. Lewis v. Casey, 518 U.S. 343, 357 (1996). "[O]nce it is established that at least one party has standing to bring the claim, no further inquiry is required as to another party's standing to bring that claim."

Maryland Shall Issue, Inc. v. Hogan, 971 F.3d 199, 209 (4th Cir. 2020).

### a. <u>Injury</u>

To establish standing, a plaintiff's injury must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." <u>Lujan</u>, 504 U.S. at 560 (internal citations, quotation marks, and footnote omitted). When plaintiffs seek prospective relief, they must establish an ongoing or imminent injury in fact. <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495-96 (1974).

Plaintiffs sufficiently allege, and Defendant does not dispute, that at least one Named Plaintiff has suffered a legally cognizable injury under Article III. (<u>See</u> Def.'s Br. (Doc. 41) at 24 (disputing causation and redressability, but not injury).) A failure to receive services in the most integrated setting appropriate to the needs of qualified individuals with disabilities is a legally cognizable injury. <u>See</u> <u>Olmstead v. L.C. ex. rel. Zimring</u>, 527 U.S. 581, 597 (1999).

Plaintiffs allege Named Plaintiffs have failed to receive child welfare services in the most integrated setting appropriate to their needs. Timothy B., Isabella A., and London R. have failed to receive community-based placements and services, even though community-based placements and services

are appropriate to their needs, resulting in unnecessary institutionalization in PRTFs. (Compl. (Doc. 35) ¶¶ 41, 46, 75, 81, 111, 117.) Because at least one Named Plaintiff has suffered a legally cognizable injury, this court need not consider whether other Named Plaintiffs have standing to seek that same form of relief.[4] See Carolina Youth Action Project v. Wilson, 60 F.4th 770, 778 (4th Cir. 2023) (declining to consider whether other plaintiffs have standing after concluding at least one of the named plaintiffs had standing).

### b. Causation

As to the causation requirement, the injury must be "fairly traceable" to the defendant's conduct. This does not mean that the plaintiffs must prove to an absolute certainty that the defendant's actions caused or are likely to cause injury; rather the "plaintiffs need only show that there is a substantial likelihood that defendant's conduct caused plaintiffs' harm." Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals

---

[4] Plaintiffs argue that Flora P. and Steph C. have standing because both were institutionalized when the suit was originally filed, were discharged before Plaintiffs filed their Amended Complaint, and remain at serious risk of re-institutionalization. (Pls.' Resp. (Doc. 53) at 21 n.2.) This court need not determine at this time whether Flora P. and Steph C. have suffered a legally cognizable injury but notes that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." Rockwell Int'l Corp. v. U.S., 549 U.S. 457, 473–74 (2007).

Inc., 913 F.2d 64, 72 (3d Cir. 1990) (quoting Duke Power Co. v. Carolina Env't Study Grp., Inc., 438 U.S. 59, 75 n.20 (1978)) (internal quotation marks omitted). While this standard excludes any injury that is "the result of the independent action of some third party not before the court, . . . [it] does not exclude injury produced by determinative or coercive effect upon the action of someone else." Bennett v. Spear, 520 U.S. 154, 169 (1997) (cleaned up).

Defendant argues there is no causal link between Defendant's conduct and the alleged injuries because "the individual Named Plaintiffs' placements and services are determined by the county DSSs and the [Local Management Entities/Managed Care Organizations]; the Complaint does not allege that the individual Named Plaintiffs' placements were the result of any action by the DHHS." (Def.'s Br. (Doc. 41) at 25.)

Here, Plaintiffs sufficiently allege a causal connection between Defendant and the alleged injury. This is not a case where "the actions of an independent third party . . . st[and] between the plaintiff and the challenged actions." (Id. at 26 (quoting Frank Krasner Enters. Ltd. v. Montgomery Cnty., 401 F.3d 230, 235 (4th Cir. 2005)).) Plaintiffs lay out detailed allegations of the "explicit principal-agent relationship"

- 17 -

established by North Carolina law between Defendant and the county departments. (Compl. (Doc. 35) ¶¶ 172, 178.)

Furthermore, Plaintiffs are not required to allege that Defendant made the individual placement decisions because Plaintiffs' claims are not based on those individual placement decisions — they are based on Defendant's administrative and supervisory role overseeing North Carolina's child welfare system. (Id. ¶ 280.) Thus, Plaintiffs have pled a causal connection. See Day v. Dist. of Columbia, 894 F. Supp. 2d 1, 22 (D.D.C. 2012) ("[T]o allege the necessary 'causal connection' between the District's actions and plaintiffs' injury," the plaintiffs need not allege the District placed them in the facility.); M.G. v. N.Y. State Off. of Mental Health, 572 F. Supp. 3d 1, 12–13 (S.D.N.Y. 2021) (Formerly incarcerated individuals with mental disabilities sufficiently alleged standing to pursue an ADA claim when they alleged that the defendants administer, oversee, and fund the state's mental health systems in a manner that resulted in unnecessary institutionalization.); Murphy by Murphy v. Minn. Dep't of Hum. Servs., 260 F. Supp. 3d 1084, 1102 (D. Minn. 2017) (Detailed allegations relating to defendants' role in overseeing the administration of disability services throughout the state established causation to support standing.).

### c. **Redressability**

As to the redressability requirement, the law requires that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" from the court. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 181 (2000). This requirement "examines the causal connection between the alleged injury and the judicial relief requested" and asks whether a judicial decision granting the requested relief will alleviate the plaintiff's alleged injury. Allen v. Wright, 468 U.S. 737, 753 n.19 (1984), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014).

Plaintiffs seek declaratory and injunctive relief which would require Defendant to administer its child welfare programs "such that it has available a sufficient supply of integrated, community-based placements and services to meet the needs of children with mental impairments in foster care," and to "[i]mplement and sustain an effective system for transitioning children with mental impairments in foster care out of PRTFs into integrated, community-based placements and services." (Compl. (Doc. 35) at 77.) Defendant argues that "it is purely speculative whether such broad and vague systemic mandates, even if compliant with Federal Rule of Civil Procedure 65(d), would

- 19 -

redress the alleged injuries of [Named Plaintiffs]." (Def.'s Br. (Doc. 41) at 26–27.) Defendant makes four main arguments to this point.

First, Defendant argues that it is speculative whether the requested injunctive relief would benefit the Named Plaintiffs individually because "increasing the supply of mental health providers and families willing to take in children with complex and severe mental health needs is a long-term effort that could not be completed before the Named Plaintiffs age out of foster care." (Def.'s Reply (Doc. 58) at 5.)

Second, Defendant argues that even if more community placements and services could be made available overnight, that would not necessarily mean the applicable county DSS or state court would conclude any of the Named Plaintiffs should be placed in the community. (Def.'s Br. (Doc. 41) at 27.) Defendant re-iterates that the final decision for placement resides with the State's treatment professionals — not Defendant. (Def.'s Reply (Doc. 58) at 6.)

Third, Defendant argues this case differs from other class action Olmstead cases because here, the "gravamen" of Plaintiffs' Complaint is that "there simply are not enough private individuals or entities providing" the community-based services and placements that Defendant offers. (Id. at 5.)

- 20 -

Defendant argues this case differs significantly from other class action <u>Olmstead</u> cases where plaintiffs sought to enjoin a specific policy or action by the state. (<u>Id.</u> at 4-5.)

Finally, Defendant argues that even if the ADA requires the State to increase the supply of community placements, that systemic responsibility lies with North Carolina's executive branch and legislature and cannot be redressed by the courts. (<u>Id.</u> at 7.)

Defendant's first argument is not persuasive. Even if Named Plaintiffs aged out of foster care by the time any requested relief was implemented, "Article III's standing requirement centers 'on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.'" <u>Edgar v. Haines</u>, 2 F.4th 298, 310 (4th Cir. 2021) (quoting <u>Davis v. FEC</u>, 554 U.S. 724, 734 (2008)). Moreover, to the extent Defendant is raising mootness as a concern, a class action may remain live despite the mootness of the claims of the class representatives. <u>Pashby v. Delia</u>, 709 F.3d 307, 316 (4th Cir. 2013) (<u>abrogated on other grounds by</u> <u>Stinnie v. Holcomb</u>, 37 F.4th 977 (4th Cir. 2022)) ("If the named plaintiff's claim is a live controversy at the time of class certification, the case will not become moot even if the named plaintiff's personal claim later expires."); <u>Jonathan R. by Dixon v. Justice</u>, 41

F.4th 316, 325 (4th Cir. 2022) ("Where a named plaintiff's individual claim becomes moot before the district court has an opportunity to certify the class, the certification may 'relate back' to the filing of the complaint if other class members 'will continue to be subject to the challenged conduct and the claims raised are . . . inherently transitory.'").

Defendant's second argument fails because at this stage of the proceeding, this court must accept the factual allegations contained in the Complaint as true. Plaintiffs allege "Defendant has created a system where unjustified institutionalization is often the only choice, even when community-based placements and services would be more appropriate." (Pls.' Resp. (Doc. 22) at 26.) Plaintiffs describe a system where children are frequently shuffled through different placements in short periods of time. (See Compl. (Doc. 35) ¶ 66.) For example, Flora P. was recently discharged from a PRTF to a Level III group home. (Id.) However, the group home did not have a therapist on staff, and Flora P. was discharged from the group home. (Id.) Since then, she has been "moved in and out of a temporary, rapid-response family foster home." (Id.) Additionally, Plaintiffs allege that "children involved with the Child Welfare system sometimes remain in a PRTF long after a discharge plan is made because there is no identified placement available for

them." (Id. ¶ 195.) Named Plaintiffs sufficiently allege that community placement is appropriate,[5] and, if this court were to grant the relief requested to make more community placements and services available, it is likely Named Plaintiffs would receive those services in the community.[6]

Additionally, the fact that Named Plaintiffs do not specifically request changes to their individual placements and services does not defeat standing — Plaintiffs "seek systemic relief from injuries resulting from systemic flaws." Jeremiah M. v. Crum, No. 22-cv-00129, 2023 WL 6316631, at *14 (D. Alaska Sept. 28, 2023) (holding plaintiffs' Olmstead claims that sought systemic relief in the foster care system were redressable). And, as discussed above, this systemic relief is likely to redress Named Plaintiffs' injuries.

---

[5] See infra Section IV.B.1.

[6] The court notes Defendant's Suggestion of Subsequently Decided Authority, Haaland v. Brackeen, 599 U.S. 255 (2023). (See Doc. 61.) In that case, the Supreme Court held that the relief Plaintiffs sought — an injunction preventing federal parties from enforcing the Indian Child Welfare Act's ("ICWA") placement preferences — would not remedy the alleged injury because state courts apply the placement preferences, state agencies carry out the court-ordered placements, and state officials who implement ICWA were nonparties who would not be bound by a judgment. Id. at 292-93. Haaland is distinguishable from this case. Plaintiffs seek to enjoin the State's Department of Health and Human Services which oversees and administers the State's child welfare system — not federal officials who have no role in administering or carrying out the mandates imposed on the child welfare system as in Haaland.

- 23 -

As to Defendant's third argument, while it is true that some Olmstead cases are aimed at specific state actions or changes in policies, there have been multiple class action Olmstead cases that base their claims on the systemic failure of the state's child welfare system, as is the case here. For example, in Jonathan R. v. Justice, No. 19-cv-00710, 2023 WL 184960 (S.D. W. Va. Jan. 13, 2023), the court denied the defendant's motion to dismiss as to the plaintiffs' Title II and Section 504 claims, which were based on a "structurally inept" foster care system. Id. at 18-20. In that case, the plaintiffs alleged the defendant, the State Department of Health and Human Services, "failed to create sufficient community or home-based mental health services to treat foster children [with mental health disabilities]," making institutionalization "the only option." Id. at 2. Similar to Plaintiffs here, the plaintiffs in Jonathan R. requested system-wide injunctive relief "that would require Defendants to overhaul the West Virginia foster care system." Id. at *3.; see also S.R. ex rel. Rosenbauer v. Penn. Dep't of Hum. Servs., 309 F. Supp. 3d 250, 254, 266 (M.D. Penn. 2018) (denying motion to dismiss ADA claims when plaintiffs alleged "systemic failures" in the child welfare system and sought injunctive relief requiring defendants to "develop a full array of appropriate [child welfare] services and placements to

- 24 -

meet the needs of children with [mental disabilities] in the most integrated settings appropriate to their needs").

Defendant's sole remaining argument is that it is not the court's role to overhaul North Carolina's foster care system. This argument implicates many competing concerns, including comity and respect for states and their institutions. However, these concerns and difficulties associated with institution-wide reforms do not mean that it is not appropriate for this court to consider such claims at all. See Horne v. Flores, 557 U.S. 433, 447–49 (2009) (discussing concerns raised by "institutional reform litigation"). In fact, the Fourth Circuit recently reversed a lower court's decision to abstain from hearing a similar Olmstead class action on federalism grounds. See Jonathan R. v. Justice, 41 F.4th 316, 321 (4th Cir. 2022) ("In this case, principles of federalism not only do not preclude federal intervention, they compel it.") While Defendants raise a compelling issue — the court's role, if any, in mandating change in the foster care system — this court will "cross the bridge of remedies only when the precise contours of the problem have been established" later in these proceedings. O'Shea v. Littleton, 414 U.S. 488, 510 (Douglas, J., dissenting).

At least one Named Plaintiff has alleged a legally cognizable injury that was caused by Defendant and is likely to

be redressed by the requested relief. Thus, this court need not dismiss Named Plaintiffs for lack of standing.

## 2.  **Associational Plaintiffs**

Next, Defendant argues that the Associational Plaintiffs lack standing because the organizations cannot assert standing in a representative capacity. (Def.'s Br. (Doc. 41) at 27.) Associational standing is an exception to the general prudential rule that a litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975). Under the doctrine of associational standing, an association may have standing to sue as the representative of its members, even in the absence of injury to itself. Id. at 511. To claim associational standing in a representative capacity, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977) (referred to as the "Hunt test").

The first two elements of the Hunt test represent the constitutional requirements of Article III standing. See United

Food & Comm. Workers Union Local 751 v. Brown Grp., Inc., 517
U.S. 544, 555-56 (1996). The third element is a "judicially
fashioned and prudentially imposed" general limitation, which
Congress may remove by statute. Id. at 558.

Defendant raises two challenges to Associational
Plaintiffs' standing.[7] First, Defendant argues DRNC's status as a
Protection and Advocacy system ("P&A system"), rather than a
traditional voluntary membership organization, precludes DRNC
from asserting the claims of the putative class. (Def.'s Br.
(Doc. 41) at 29.) Second, Defendant argues neither Associational
Plaintiff can satisfy the third element of the Hunt test because
the claim asserted and the relief requested requires
participation of individual members in the lawsuit. (Id.)

### a.  P&A Systems' Standing

DRNC is designated as the statutorily authorized P&A system
for the State of North Carolina, charged with protecting and
advocating for the rights of individuals with disabilities.
(Compl. (Doc. 35) ¶ 27.) As the State's designated P&A system,
Congress has granted DRNC the authority to "pursue
administrative, legal, and other appropriate remedies to ensure

_____

[7] Defendant does not dispute, and this court assumes without
deciding, that Plaintiffs have made a facial showing that the
interests at stake are germane to each group's organizational
purpose. (See Compl. (Doc. 35) at ¶¶ 29, 34.)

the protection of individuals with mental illness who are
receiving care or treatment in the State." 42 U.S.C.
§ 10805(a)(1)(B); (Compl. (Doc. 35) ¶ 31.) "DRNC is accountable
to members of the disability community." (Compl. (Doc. 35)
¶ 31.)

> More than half of DRNC's board of directors and advisory
> council members are individuals with disabilities or
> family members, guardians, or advocates for individuals
> with disabilities. DRNC conducts annual surveys of the
> disability community to determine the specific areas of
> advocacy on which the organization will focus. Members
> of the disability community have the right to file
> grievances if they disagree with actions taken by DRNC
> or are wrongly denied services by DRNC.

(Id.) DRNC does not have members in the traditional sense of a
voluntary, membership-based organization, but rather represents
the interests of its constituents — individuals with mental
illness who are receiving care or treatment in North Carolina.
(Compl. (Doc. 35) ¶ 27.) The issue is whether DRNC may borrow
the standing of its constituents to bring suit on their behalf.

        In order to satisfy the first Hunt element, a
non-membership organization must show that its constituents
possess sufficient "indicia of membership" in an organization
such that the organization sufficiently represents those
constituents' interests. Hunt, 432 U.S. at 344. In Hunt, the
Supreme Court held that the non-membership organization, the
Washington State Apple Advertising Commission, had associational

- 28 -

standing to assert claims on behalf of its constituents when the state's apple growers and dealers alone elected members of the Commission, served on the Commission, and financed its activities. Id. at 344-45. The Court explained, "[i]n a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." Id. at 345. In deciding whether a non-membership organization may bring a claim on behalf of its constituents, the goal "is to ensure that the organization claiming associational standing actually represents the individual 'members' on whose behalf it purports to bring suit." AARP v. U.S. Equal Emp. Opportunity Comm'n, 226 F. Supp. 3d 7, 16 (D.D.C. 2016).

The Fourth Circuit has not ruled on whether a P&A system such as the DRNC has associational standing to bring claims on behalf of disabled individuals. There is a circuit split on whether P&A systems may assert associational claims on behalf of their constituents. The Fifth and Eighth Circuit Courts of Appeals have denied associational standing to P&A systems, while the Ninth and Eleventh Circuit Courts of Appeals have granted associational standing to P&A systems.

In Ass'n for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Center Board of Trustees, 19 F.3d

- 29 -

241 (5th Cir. 1994), the Fifth Circuit denied associational standing to the federally funded advocacy group because the organization "[bore] no relationship to traditional membership groups because most of its 'clients' — handicapped and disabled people — [were] unable to participate in and guide the organization's efforts." Id. at 244. In Missouri Protection & Advocacy Services, Inc. v. Carnahan, 499 F.3d 803 (8th Cir. 2007), the Eighth Circuit agreed with the Fifth Circuit and held the constituents of the P&A system did not have a sufficiently close relationship to the organization for the organization to have associational standing. Id. at 810.

In Doe v. Stincer, 175 F.3d 879 (11th Cir. 1999), the Eleventh Circuit held that a P&A system "may sue on behalf of its constituents like a more traditional association may sue on behalf of its members" because, like a traditional membership-based organization, the constituents of the advocacy group "possess the means to influence the priorities and activities" the group undertakes. Id. at 886. Similarly, in Oregon Advocacy Center v. Mink, 322 F.3d 1101 (9th Cir. 2003), the Ninth Circuit recognized that although the Advocacy Center's constituents did not have all of the "indicia of membership" found in Hunt because they did not fund the organization, they served on the Advocacy Center's board and advisory council and

- 30 -

thus "possess[ed] the means to influence the [organization's] priorities and activities." Id. at 1112.

District courts in North Carolina have held that DRNC may assert associational standing on behalf of its constituents. See Wilson v. Thomas, 43 F. Supp. 3d 628, 632 (E.D.N.C. 2014); Disability Rts. N.C. v. N.C. State Bd. of Elections, No. 21-CV-361, 2022 WL 2678884, at *2 (E.D.N.C. July 11, 2022); Bone v. Univ. of N.C. Health Care Sys., No. 18cv994, 2019 WL 4393531, at *10-11 (M.D.N.C. Sept. 13, 2019) (Auld, Mag. J.), R. & R. adopted by 2020 WL 1062421 (M.D.N.C. Mar. 5, 2020).

Given DRNC's statutory mandates, and the ability of DRNC's constituents to influence its priorities and activities, this court finds that DRNC may sue on behalf of its constituents as a traditional membership organization may. See Disability Rts. N.Y. v. N.Y. State, No. 17-cv-6965, 2024 WL 20753, at *5-12 (E.D.N.Y. Jan. 2, 2024) (providing an overview of associational standing and P&A systems); see also Disability Rts. Pa. v. Pa. Dep't of Hum. Servs., No. 19-CV-737, 2020 WL 1491186, at *8 n.6 (M.D. Pa. Mar. 27, 2020) (collecting cases that have concluded P&A systems have associational standing).

As explained supra Section III.B.1, at least one Named Plaintiff has standing and is a constituent of DRNC. Additionally, this court found that at least London R. has

standing, who is a youth member of the NC NAACP. (Compl. (Doc. 35) ¶ 112.) Thus, constituents of DRNC or members of NC NAACP would otherwise have standing to sue in their own right, satisfying the first element of the Hunt test.

### b. Nature of the Claim and Relief Requested

Defendant also argues that neither Associational Plaintiff can satisfy the third Hunt element because the injunctive relief sought would require a fact-intensive inquiry into individualized situations.

The third Hunt requirement — that neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit — is a prudential requirement that "is best seen as focusing on . . . matters of administrative convenience and efficiency." United Food, 517 U.S. at 557. The third Hunt requirement is meant to reflect the "background presumption" that "litigants may not assert the rights of absent third parties." Id. (emphasis added). The judicially imposed rule is meant to promote adversarial intensity and guard against the hazard associated with litigating damages claims on a representational basis. Id.

When Congress has authorized an organization to sue on its members behalf, and "the only impediment to that suit is a general limitation, judicially fashioned and prudentially

imposed, there is no question that Congress may abrogate the impediment." Id. at 558. The parties did not address the issue of whether DRNC must satisfy the third requirement of Hunt, or whether it has been abrogated by Congress.

Congress has granted DRNC the authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. § 10805; (Compl. (Doc. 35) ¶ 27.) Although the Fourth Circuit has not ruled on the issue, district courts and the Ninth Circuit have held that Congress abrogated the third Hunt prudential requirement for P&A systems by authorizing them to pursue legal remedies to protect individuals with mental disabilities. See Or. Advoc. Ctr., 322 F.3d at 1113; Tellis v. LeBlanc, No. 18-cv-0541, 2019 WL 1474777, at *4 (W.D. La. Apr. 3, 2019) (collecting cases); see also Trivette v. Tenn. Dep't of Corr., No. 20-cv-00276, 2020 WL 6685557, at *6 n.6 (M.D. Tenn. Nov. 12, 2020) (stating the third Hunt element "arguably should not apply to a P&A organization at all").

This court agrees that Congress has abrogated the third Hunt requirement as it applies to DRNC in this context, thus DRNC may assert associational standing on behalf of Named Plaintiffs. However, even if this court is mistaken in its

- 33 -

analysis of Congressional abrogation, because this court concludes that the nature of the claim and the relief requested do not require individual participation of members, as explained below, DRNC may assert associational standing.

Generally speaking, the third element of <u>Hunt</u> is satisfied when an association seeks injunctive or declaratory relief as opposed to monetary damages. <u>See</u> <u>Retail Industry Leaders Ass'n v. Fielder</u>, 475 F.3d 180, 187 (4th Cir. 2007) ("Unlike a suit for money damages, which would require examination of each member's unique injury, this action seeks a declaratory judgment and injunctive relief, the type of relief for which associational standing was originally recognized."); <u>Students for Fair Admissions, Inc. v. Univ. of North Carolina</u>, No. 14CV954, 2018 WL 4688388, at *6 (M.D.N.C. Sept. 29, 2018). <u>But see</u> <u>New Hampshire Motor Transport Ass'n v. Rowe</u>, 448 F.3d 66, 72 (1st Cir. 2006), aff'd, 552 U.S. 364, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008) (clarifying that injunctive relief will not satisfy <u>Hunt's</u> third prong where adjudication of the claim requires the court to engage in a "sufficiently fact-intensive inquiry").

Defendant relies on <u>Parent/Professional Advocacy League v. City of Springfield</u>, 934 F.3d 13 (1st. Cir. 2019), in support of its position that the nature of the claim and the relief sought

- 34 -

here is inherently individualized and thus the Associational Plaintiffs do not have representative standing. (See Doc. 41 (Def.'s Br.) at 28.)

In Parent/Professional Advocacy League, a proposed class of plaintiffs alleged that the school district discriminated against students with mental health disabilities by segregating them in separate and inferior schools. 934 F.3d at 17. The First Circuit found that although the complaint facially brought an ADA claim, "the crux of the complaint [was] that the defendants failed to provide the educational instruction and related services that the class plaintiffs need to access an appropriate education in an appropriate environment," in violation of the Individuals with Disabilities Education Act ("IDEA"). Id. at 25. In essence, the suit was "challenging hundreds of individualized decisions made in a decentralized environment." Id. at 29.

The First Circuit held that the associational plaintiffs lacked standing because the "adjudication of the claims . . . would turn on facts specific to each student, including unique features of each student's unique disability, needs, services, and placement." Id. at 35. The court also denied the plaintiffs' motion for class certification for failure to satisfy commonality. Id. at 28. The court reasoned the "plaintiffs' claims are not 'systemic'" . . . "[a] finding that one student

- 35 -

with a certain type and degree of mental health disability should have been mainstreamed would not mean that another student with a different type, or even just a different degree, of mental health disability should have received the same services or been mainstreamed." Id. at 27–28.

Parent/Professional Advocacy League is distinguishable from the case here because Plaintiffs are not bringing a claim under the IDEA, which is inherently individualized. The IDEA requires the delivery of certain services "in conformity with the [student's] individualized education program." Id. at 19 (quoting 20 U.S.C. § 1401(9)(D)). Here, Plaintiffs are not challenging their individual placement decisions or asking this court to make findings about what specific services an individual in the child welfare system may require. (See Pls.' Resp. (Doc. 53) at 26–27.) Plaintiffs' claims are based on the allegation that children with disabilities are generally eligible to receive community-based services yet are systemically institutionalized. (See generally Compl. (Doc. 35.).) The issue of whether Plaintiffs satisfy the community requirement must be determined at the class certification stage.

Here, the nature of the claim and the relief requested do not require individual participation of members. See Joseph S.

- 36 -

v. Hogan, 561 F. Supp. 2d 280, 308 (E.D.N.Y. 2008) ("Plaintiffs
do not contend that any individual plaintiff . . . is entitled
to a court order placing him or her in a community-based
treatment program; rather, they allege that defendants have
discriminatory policies and practices that unnecessarily place
individuals with mental illness in nursing homes as a matter of
routine, and without first conducting legally required
assessments. Thus, the focus of plaintiffs' proof will be on
defendants' actions."); Ball v. Kasich, 244 F. Supp. 3d 662,
(S.D. Ohio 2017) (holding organization had associational
standing to bring Olmstead claim on behalf of its constituents).
The fact that "litigation will require evidence and testimony
from a representative sample of [individuals]" will not defeat
associational standing. Allen v. City, No. 20-cv-998, 2021 WL
2223772, at *5 (M.D.N.C. June 2, 2021). "[I]ndividual
participation of each injured party" is not necessary here.
Warth v. Seldin, 422 U.S. 490, 511 (1975) (emphasis added).

        DNRC and NC NAACP have facially alleged associational
standing to pursue the claims of their constituents in a
representative capacity. At this stage in the litigation, taking
the facts as alleged by Plaintiffs as true, Defendant's motion
to dismiss for lack of standing and subject matter jurisdiction
will be denied.

## IV. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Defendant also moves to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing Plaintiffs have failed to state a claim. (Def.'s Mot. (Doc. 40) at 1.)

### A. Standard of Review

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In other words, the plaintiff must plead facts that "allow[] the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556–57). The factual allegations must be sufficient to "raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570; see also Iqbal, 556 U.S. at 680; Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (applying the Twombly/Iqbal standard to evaluate the legal sufficiency of pleadings). When ruling on a motion to dismiss, a court must accept the complaint's well-pleaded factual allegations as true and view the complaint in the light most favorable to the

plaintiff. Iqbal, 556 U.S. at 676—79. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678.

**B. Analysis**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA's implementing regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

The Supreme Court addressed the integration mandate in Olmstead v. L.C. ex. rel. Zimring, 527 U.S. 581 (1999), holding that unjustified institutional isolation of persons with disabilities is a form of unlawful discrimination based on disability. Id. at 600. Under Olmstead, community placement is required when: (1) "the State's treatment professionals have determined that community placement is appropriate;" (2) "the transfer from institutional care to a less restrictive setting is not opposed by the affected individual;" and (3) "the placement can be reasonably accommodated, taking into account

the resources available to the State and the needs of others with mental disabilities." Id. at 587. Here, Plaintiffs allege facts to sufficiently state an Olmstead claim.

### 1.  Community Placement is Appropriate

Defendant argues that this court should dismiss Plaintiffs' claims because four of the five Named Plaintiffs (Timothy B., Isabella A., Flora B., and Steph C.) do not allege that their placement was inconsistent with the recommendations of the State's treatment professionals. (Def.'s Br. (Doc. 41) at 15.)[8] Specifically, Defendant argues state treatment professionals determined PRTF placement was "medically necessary" for Plaintiffs Timothy B. and Isabella A., and Plaintiffs Flora B. and Steph C. were moved out of PRTFs to a lower-level residential treatment program (Level III placements) based on the recommendations of treatment professionals. (Id. at 17.)

While Olmstead involved a case where the state's treatment professionals determined community placement was appropriate, later decisions by lower courts have concluded that such a

---

[8] Defendant also argues London R. cannot state a claim because she was only temporarily placed in a PRTF to receive treatment while awaiting community placement, and, under these circumstances, "it is reasonable for the State to ask someone to wait until a community placement is available." (Def.'s Br. (Doc. 41) at 17–18.) This argument goes whether placement can be reasonably accommodated and will be addressed infra Section IV.B.3.

finding is not required to state a claim. See M.J. v. District of Columbia, 401 F. Supp. 3d 1, 12-13 (D.D.C. 2019); Day v. District of Columbia, 894 F. Supp. 2d 1, 23 (D.D.C. 2012) (collecting cases of lower courts that have rejected the argument that Olmstead requires an allegation that the State recommend community placement to state a claim).

This court agrees with those courts on the facts alleged here and concludes the allegations are sufficient to plausibly state a claim. Plaintiffs allege that community-based placement is appropriate for each Named Plaintiff, (Compl. (Doc. 35) ¶¶ 52, 69, 86, 104, 123), and includes sufficient factual detail to support this allegation at the motion to dismiss stage. For example, the Complaint alleges: "The PRTF has repeatedly talked with Timothy B. about transitioning him to a lower level of care," (id. ¶ 54); "Flora B. was recommended for a Level III Group Home placement . . . ," (id. ¶ 70); "[Isabella A.] was previously placed in several community-based TFC homes," (id. ¶ 86); "Steph C. has previously lived in several different community-based placements with community-based treatment," (id. ¶ 106); and "London R.'s treatment providers first recommended she be placed in Intensive Alternative Family Treatment (IATF) foster care, a North Carolina community-based therapeutic foster care program," (id. ¶ 123). These factual allegations are

consistent with Plaintiffs' claims that Plaintiffs are
frequently institutionalized not because it is required or
appropriate, but because of a lack of community-based
alternatives. These factual allegations are sufficient to allege
that community-based placement is appropriate for Named
Plaintiffs.[9]

Defendant additionally argues that Named Plaintiffs Flora
B. and Steph C. fail to state a claim because they have been
moved from their PRTFs to lower-level treatment residential
programs at the recommendation of state treatment professionals.
(Def.'s Br. (Doc. 41) at 17.) Plaintiffs respond that Flora B.
and Steph C. remain at serious risk of re-institutionalization,
which is sufficient to state a claim under Olmstead. (Pls.'
Resp. (Doc. 53) at 21 n.2.)

The Fourth Circuit has held that Olmstead extends to those
at serious risk of institutionalization. Pashby v. Delia, 709

_____

[9] "At a later stage, Plaintiffs will be required to provide
evidence to back up their claims" that community-based placement
and treatment is appropriate, but not at the motion to dismiss
stage. See M.J. v. District of Columbia, 401 F. Supp. 3d 1, 13
(D.D.C. 2019).

F.3d 307 (4th Cir. 2013).[10] After this motion to dismiss was
filed, Defendant filed a suggestion of subsequently decided
authority — United States v. Mississippi, 82 F.4th 387 (5th Cir.
2023). In that case, the Fifth Circuit, looking at the plain
text of Title II and the integration mandate, held that Olmstead
does not extend to those merely at risk of institutionalization.
Id. at 392. Following a bench trial, the district court had
found that the State's mental health system violated Title II of
the ADA and issued a remedial injunctive order. Id. at 390. The
Fifth Circuit reversed, holding that Olmstead does not supply a
"basis for an at-risk claim like that litigated en masse in this
case," when "not one individual's treating physician testified
about the 'justifiability' of that person's past
institutionalization, much less a 'risk' that the person would
be 'unjustifiably institutionalized' in the future." Id. at 394.
The Fifth Circuit explained that an "Olmstead case turns on
actual 'unjustifiable institutionalization,' not on hypothetical
future events." Id.

---

[10] Pashby is consistent with other Circuit court holdings.
See Davis v. Shah, 821 F.3d 231 (2d Cir. 2016); Waskul v.
Washtenaw Cnty. Cmty. Mental Health, 979 F.3d 426 (6th Cir.
2020); Steimel v. Wernert, 823 F.3d 902 (7th Cir. 2016); M.R. v.
Dreyfus, 697 F.3d 706 (9th Cir. 2012); Fisher v. Okla. Health
Care Auth., 335 F.3d 1175 (10th Cir. 2003). But see United
States v. Mississippi, 82 F.4th 387 (5th Cir. 2023).

United States v. Mississippi is distinguishable from the case here.[11] At this stage, the court must accept the facts alleged by Plaintiffs as true. Timothy B., Isabella A., and London R. are all currently unnecessarily institutionalized. (Compl. (Doc. 35 ¶¶ 41, 75, 111.) At the time Plaintiffs filed their original Complaint, Flora P. and Steph C. were also institutionalized, but they have since been discharged. (See Pls.' Resp. (Doc. 53) at 21 n.2.) Although community-based placement is appropriate for Flora P. and Steph C., they have been unable to secure a stable, long-term placement in the community, putting them at serious risk of re-institutionalization. (Compl. (Doc. 35) ¶ 66, 109.) Considering the facts as alleged by the Plaintiff, unjustified institutionalization is not a "hypothetical future event" for Flora P. and Steph C.

---

[11] In United States v. Mississippi, the Fifth Circuit also stated decisions, including Pashby, holding that a plaintiff at serious risk of institutionalization may bring an Olmstead claim, was superseded by the United States Supreme Court decision, Kisor v. Wilkie, 588 U.S. --, 139 S. Ct. 2404 (2019). Mississippi, 82 F.4th at394. Kisor narrowed the circumstances under which a court may afford Auer deference to an agency's interpretation of its own regulation, clarifying that "the possibility of deference can arise only if a regulation is genuinely ambiguous." 139 S. Ct. at 2414. Although United States v. Mississippi was decided after Defendant filed its motion, Kisor was decided in June 2019. Neither party addressed how Kisor may affect Pashby's holding, and it appears no district court in the Fourth Circuit has addressed the issue. This court may address this potential issue at a later time if necessary.

Case 1:22-cv-01046-WO-LPA   Document 72   Filed 03/29/24   Page 44 of 51

Thus, this court will not decline to consider Flora P.'s and Steph C.'s claims on the basis that they are not currently institutionalized. See Jeremiah M. v. Crum, No. 22-cv-129, 2023 WL 6316631, at *26 n.318 (D. Alaska Sept. 28, 2023) (noting defendant's Notice of Supplemental Authority, United States v. Mississippi, 82 F.4th 387 (5th Cir. 2023), but finding "no reason to deviate from Ninth Circuit precedent.").

In sum, Plaintiffs are not required to allege that the State's treatment professionals have recommended community-based placement to state an Olmstead claim. Furthermore, the fact that some plaintiffs are not currently institutionalized will not defeat their claims when those plaintiffs are at serious risk of re-institutionalization. Accordingly, Plaintiffs allege facts to satisfy the first element of an Olmstead claim.

## 2. **Plaintiffs Do Not Oppose Community-Based Placement**

Defendant argues that Plaintiffs fail to allege that the parents, guardians, or custodians of Named Plaintiffs have chosen community-based treatment and thus fail to state a claim under Olmstead. (Def.'s Br. (Doc. 41) at 18.) Defendant argues that under state law, the choice as to the mental health services to be provided to minors, and the preferred setting for those services, is exercised on behalf of the children either by

- 45 -

their natural parents or guardian, by DSS, or pursuant to a court order. (Id. at 18–21.) Defendant further argues that "there are multiple checkpoints to ensure that the minor is receiving services appropriate to their level of need," including mandated judicial review of all voluntary placements of any minor in a PRTF. (Id. at 20–21.)

Olmstead only requires that plaintiffs do not oppose receiving community-based services. 527 U.S. at 607. Here, each Named Plaintiff clearly alleges that they in fact desire community-based treatment. (See Doc. 35 ¶¶ 58, 71, 88, 107, 125.) As Plaintiffs explain, a minor is not required to allege that their custodian requested community placement or treatment to state a claim under Olmstead, only that "the transfer from institutional care to a less restrictive setting is not opposed by the affected individual." Olmstead, 527 U.S. at 587. Thus, Plaintiffs allege facts to satisfy the second element of an Olmstead claim.

### 3.   **Reasonable Accommodation**

Finally, Plaintiffs allege facts to satisfy the third element of an Olmstead claim — that community placement and treatment can be reasonably accommodated. The third Olmstead element stems from the regulation that public entities must make "reasonable modifications in policies, practices, or procedures

when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). However, modifications are not required if "the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." Id.

Thus, as the plurality in Olmstead explained, "the reasonable-modifications regulation speaks of 'reasonable modifications' to avoid discrimination, and allows States to resist modifications that entail a 'fundamenta[l] alter[ation]' of the States' services and programs." Olmstead, 527 U.S. at 603. In other words, Olmstead does not require states to create new programs or provide a certain base-line level of benefits. 527 U.S. at 612 (Kennedy, J., concurring). However, with regard to the services they in fact provide, such as the child welfare system or community treatment, the State "must make reasonable modifications so that Plaintiffs can fully participate in" those services. Jonathan R. v. Justice, No. 19-cv-710, 2023 WL 184960, *19 (S.D. W. Va. Jan. 13, 2023). In evaluating a State's fundamental-alteration defense, the court must consider the resources available to the State, the cost of providing community-based services, the range of services the State provides others with mental disabilities and the State's

obligation to provide such services equitably. <u>Olmstead</u>, 527
U.S. at 597.

Here, Plaintiffs allege community-based placements and
services yield better outcomes and are less costly to provide.
(Compl. (Doc. 35) ¶¶ 2, 13, 15–16.) They also allege waitlists
pose a barrier to receiving community-based services. (<u>Id.</u>
¶¶ 14, 260.)

Defendant argues that <u>Olmstead</u> does not require the State
to expand community programs that are operating at capacity and
may, consistent with the ADA, maintain a "waiting list" that
"moves at a reasonable pace not controlled by the State's
endeavors to keep its institutions fully populated." (Def.'s
Reply (Doc. 58) at 10.) Specifically, Defendant argues London R.
fails to state a claim because she was only temporarily placed
in a PRTF to receive treatment while awaiting community
placement. (Def.'s Br. (Doc. 41) at 17–18.) Plaintiffs allege
London R.'s placement "was intended only as a short-term,
emergency placement," but she "has languished at this PRTF for
nearly four months and remains there today." (Compl. (Doc. 35)
¶ 117.)

The plurality in <u>Olmstead</u> recognized that "[i]f, for
example, the State were to demonstrate that it had a
comprehensive, effectively working plan for placing qualified

- 48 -

persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met." 527 U.S. at 605-06. However, whether Defendant has an effectively working plan, including a waiting list that moves at a reasonable pace, is a fact-specific inquiry not appropriate for determination at the motion to dismiss stage. See Guggenberger v. Minnesota, 198 F. Supp. 3d 973, 1030-31 (D. Minn. 2016). Defendant cites cases in support of its argument where the court found that the fundamental alteration defense applied at the summary judgment stage or in an order following trial. See Arc of Wash. State Inc. v. Braddock, 427 F.3d 615, 622 (9th Cir. 2005) (summary judgment); Sanchez v. Johnson, 416 F.3d 1051, 1068 (9th Cir. 2005) (summary judgment); Bryson v. Stephen, No. 99-CV-558, 2006 WL 2805238, at *9 (D.N.H. Sept. 29, 2006) (order following trial). This issue must be resolved at a later stage of the proceedings.

Plaintiffs have sufficiently pled facts to allege a discrimination claim under Olmstead, thus Defendant's motion to dismiss for failure to state a claim will be denied.

**V.    ISSUE PRECLUSION**

Last, Defendant argues that Plaintiffs' claims are barred by claim and issue preclusion. (Def.'s Br. (Doc. 41) at 21–23.) Defendant states

> state law requires that every child who is admitted to a PRTF have a hearing in state court in the district in which the PRTF is located to determine if there is "clear, cogent, and convincing evidence" that the minor is mentally ill or a substance abuser, in need of further treatment at a 24-hour facility, and that less restrictive measures will be insufficient.

(Id. at 22.) Defendant argues these state court hearings, known as Chapter 122C proceedings, provide Plaintiffs a "'full and fair opportunity' to litigate whether their admission to PRTF was necessary or whether a less restrictive option was sufficient," and thus should be barred from re-litigating that issue in federal court. (Id. at 23.)

Plaintiffs respond that the issues in this case are distinct from the issues necessary to the disposition of North Carolina's Chapter 122C proceedings. (Pls.' Resp. (Doc. 53) at 44–45.) Chapter 122C proceedings only consider placement options currently available. See In re M.B., 240 N.C. App. 140, 156, 771 S.E.2d 615, 626 (2015) ("Chapter 122C makes clear our General Assembly's intent to provide 'within available resources' mental health services that are 'designed to meet the needs of clients in the least restrictive, therapeutically most

- 50 -

appropriate setting <u>available</u>.'"). Plaintiffs' claims are based on Defendant's systemic failures to provide an adequate supply of community-based services to children in foster care who would otherwise qualify for such services. Any state court proceeding determining that placement in a PRTF was the most appropriate placement available at the time does not preclude this current action. <u>See</u> <u>Jonathan R. v. Justice</u>, No. 19-cv-710, 2023 WL 184960, at *20 (S.D.W. Va. Jan. 13, 2023) ("Defendants have simply failed to create in-home and community-based treatment settings. Thus, when placing Plaintiffs, state courts had no choice but to institutionalize them. To the extent Defendants think these placements were in any way 'justified' under <u>Olmstead</u>, they are wrong.").

## VI. <u>CONCLUSION</u>

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss, (Doc. 40), is **DENIED**.

This the 29th day of March, 2024.

_____
United States District Judge

- 51 -